[No. 65064-5-I.   Division One.   September 19, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES RAYMOND READ, *Appellant*.

*James E. Lobsenz* (of *Carney Badley Spellman*), for appellant.

*Daniel T. Satterberg*, *Prosecuting Attorney*, and *Ann M. Summers*, *Deputy*, for respondent.

¶1 SCHINDLER, J. — A person commits the crime of malicious harassment by intentionally threatening a specific individual and placing that individual in reasonable fear of harm because of the victim's race, color, ancestry, national origin, gender, sexual orientation, or mental, physical, or sensory handicap.[1] Charles Read appeals his conviction of malicious harassment, arguing the evidence does not establish beyond a reasonable doubt that he maliciously and intentionally threatened the victim because of her race, and the trial court erred in failing to determine whether race was the primary motivating factor. Read also argues insufficient evidence supports the finding that he made a "true threat." We hold that the virulent racial epithets Read used coupled with his aggressive and intimidating conduct establish beyond a reasonable doubt that Read intentionally and maliciously threatened the victim because of her race, color, ancestry, or national origin, and sufficient evidence supports the trial court's finding that Read made a true threat.

## FACTS

¶2 Saba Zewdu and her family emigrated from Ethiopia to the United States when she was six years old. Zewdu completed two years of college and speaks fluent English. In May 2009, 28-year-old Zewdu was working as a parking

---

[1] RCW 9A.36.080.

lot attendant for Diamond Parking Service at the Elliott Bay Marina in Seattle. Zewdu is five feet two inches tall and weighs approximately 120 pounds.

¶3 On May 7, Charles Read and his spouse, Arlene Read, drove to the Elliott Bay Marina to have dinner. Read is a Caucasian man who owns a manufacturing company. Sixty-three-year-old Read is six feet tall and weighs approximately 240 pounds. Because Read did not want to park his Ford F-150 Super Crew Cab pickup truck near another vehicle, he parked the truck across at least two parking spaces in the parking lot.

¶4 Zewdu issued Read a parking ticket for improperly parking his truck across more than one parking space. Read and his spouse left the restaurant at approximately 5:45 p.m. When Read found the parking ticket, he was furious. Read immediately got into his truck and drove across the parking lot to talk to the valet working at an adjacent restaurant, Brian Smith, a Caucasian male.

¶5 During the conversation between Read and Smith, Read remained inside the truck. Read rolled down the truck window and yelled at Smith, " 'What is this? Who wrote this? I am not going to pay it. This is bullshit.' " Smith said that he did not issue the ticket and told Read that he should call the telephone number located on the back of the ticket. Read then asked Smith "where he could find the person who gave him the ticket." Smith pointed toward the Diamond parking lot.

¶6 When Read "spott[ed]" Zewdu, he drove toward her "in a manner that screeched his trucks [sic] tires." After Read stopped the truck near Zewdu, he yelled at her, " 'Did you give me this fucking ticket?' " Zewdu said that she issued the ticket and told him to call the number on the back if he had any questions. Read then yelled, " 'You nigger, you gave me this fucking ticket,' " and got out of his truck.

¶7 Read's face and the veins in his eyes were red, he "was shaking in rage," and his fists were clenched. As he ad-

vanced toward Zewdu, Read repeatedly yelled, " 'You g[a]ve me this fucking ticket.' " When Read got to within two to three feet of Zewdu, she started backing away from him, and Read asked Zewdu, " 'Do you know who I am?' " Zewdu told Read that he should call the number on the ticket and there was nothing she could do. Zewdu continued to back away, but Read kept advancing toward her, yelling several more times, " 'You nigger, you gave me this fucking ticket' " and " 'You nigger! Do you know who the fuck I am?' " When Zewdu replied that she was Ethiopian, Read yelled at her, "You fucking Ethiopian! You fucking Ethiopian!"

¶8 Zewdu was frightened. There was no one else in the parking lot except Arlene Read, who remained inside the truck the entire time. Zewdu said that as Read continued to advance toward her "with rage and clenched fists," she tried to stop him by telling him that there were cameras at the marina and holding up her cell phone. Zewdu told Read that she was going to call the police. Read responded, " 'I don't care about fucking cops. . . . I know where you work.' " Zewdu then turned and started running away. While she was running, Zewdu heard the truck engine revving and the tires screeching in her direction. Zewdu hid in the bushes while she called 911. Zewdu told the 911 operator:

| | |
|---|---|
| CALLER: | Yes, I have a Ford he's threatening me and coming after me with a car (unintelligible) his vehicle and (unintelligible) from here, and he's (unintelligible). |
| . . . . | |
| CALLER: | He (unintelligible) parking and (unintelligible) parking he kept calling me a nigger and threatening me. He kept coming in his car and I kept (unintelligible). |
| OPERATOR: | Okay, where is he right now? |
| CALLER: | Um . . . . |
| OPERATOR: | Still in the parking lot? |
| CALLER: | Yes, and he . . . . |
| . . . . | |

OPERATOR: Okay, did he actually (unintelligible) or he just threatened to hurt you?

CALLER: He came after me.

. . . .

OPERATOR: Okay, what did he . . . did he say anything to you or was he threatening you?

CALLER: Yes, he called me names (unintelligible).

OPERATOR: Okay, I (unintelligible) called you names but did he say he was gonna hurt you?

CALLER: He said I was a nigger and he kept coming after me.

OPERATOR: Okay, with what, with his fist or with his car?

CALLER: Yes, with him self [sic] physically.

OPERATOR: Okay, is he in his car now?

CALLER: Yes, he . . . he's following me . . .

. . . .

CALLER: He . . . he I told him I gonna call the cops on him he . . . he didn't care. And he just kept chasing me and now he's in his car running around (unintelligible).

. . . .

OPERATOR: Okay, do you see him right now?

CALLER: Ah, I'm running and hiding behind the bushes (unintelligible).

. . . .

OPERATOR: Okay, why did this happen? Do you have any idea why he got so angry?

CALLER: (Unintelligible) ticket, that's my job . . .

OPERATOR: Um hum.

CALLER: . . . to get the ticket.

OPERATOR: Okay, do you have any weapons on you are you armed at all?

CALLER: No, I don't have . . . I . . . I just work here, I get tickets.

OPERATOR: Okay, it's okay, take a deep breath, we're gonna send somebody out there to help you, okay?

. . . .

CALLER:        I'm the only one who does the lot.

OPERATOR:    Okay.

CALLER:        I'm talking with the office right now.

OPERATOR:    Okay, once you get to the office can you lock yourself in there until we get there?

CALLER:        Yes.

OPERATOR:    Okay, I'm gonna stay on the phone with you till you get over there, okay?

CALLER:        Okay, [talking to someone in background] hi, I'm talking to them right now.

¶9  After calling 911, Zewdu ran to the harbor master's office. Marina dockhand John De Maria and Smith were in the office and said that when Zewdu arrived, she was crying and trembling. Smith testified that Zewdu was so upset that she was only able to stop crying approximately 20 minutes later.

¶10  Sergeant William Robertson responded to the 911 call. Zewdu showed Sergeant Robertson the truck license plate number she wrote on her hand. Zewdu said she was afraid Read was going to come back and kill her and asked Sergeant Robertson to stay with her. Before leaving, Sergeant Robertson suggested that Zewdu buy pepper spray.

¶11  For the next several days, Zewdu had trouble sleeping. Zewdu purchased pepper spray, asked her supervisor to change her shift, and asked the staff at the marina to frequently patrol the parking lot when she was at work.

¶12  The State charged Read with malicious harassment. Read entered a plea of not guilty and waived his right to a jury trial.

¶13  Zewdu, Smith, De Maria, Sergeant Robertson, Detective Rolf Norton, and Charles and Arlene Read testified at trial. The recording of the 911 call was admitted into evidence.

¶14  Read testified that he was angry and admitted using profanity and racial slurs, but said that he did not intend to

threaten Zewdu. Read testified that he only wanted to understand why Zewdu issued the parking ticket, and the reason he got out of his truck was because "it was the proper thing to get out and greet somebody that is walking towards you."

¶15 Arlene Read testified that her husband was very upset about the parking ticket because he thought Diamond was trying to steal from him. Arlene said that she "cringed" when she heard Read use a racial slur but that he later apologized to her. Arlene also testified that Zewdu did not look like she was upset. According to Arlene, Zewdu "did not cry while we were there. She was very stoic."

¶16 Based on the testimony and evidence at trial, the court found Zewdu's testimony credible, and rejected the testimony of Read and his spouse, Arlene, as not credible. The court found Read guilty of maliciously and intentionally threatening Zewdu and placing her in fear of harm because of her race, national origin, ethnicity, or color. The court found that Read's statement that "I don't give a fuck about cops. . . . I know where you work" coupled with his conduct, including "his clenched fists, red face, raged look, and manner in which he approached [her,] . . . clearly amounted to a threat."

¶17 The court's oral ruling states, in pertinent part:

The Court considered the following: I considered the exhibits, all of them; the 911 tape, I listened to it in chambers twice; the testimony of Ms. Zewdu, Mr. Read, Mrs. Read, Brian Smith, Mr. De Maria, and the police officers.

One of the key elements of testimony to me is: Why get out of the car? On the stand at first Mr. Read said he got out of the car to greet her. I don't think that he even believes that. I think he got out of the car to get in her face. He was angry. He felt that he was being stolen from. He got out of the car to put her in fear, to intimidate.

A defendant commits the crime of malicious harassment if he or she maliciously and intentionally commits the act because of his or her perception of a victim's race. The threats or

threat, if there was one, were made because of Mr. Read's perception of the victim's race. The use of the N word is proof of that to me. I can't think of a more despicable term.

It is one thing if somebody walks down the hall and somebody sitting on the bench says the N word, or "That person is an N word," or "That person is acting like an N word," but to use it in the context of this altercation, this confrontation, is particularly offensive. I can't think of a more offensive word. And what he was trying to do was to put her in fear, to intimidate her, to demean her.

The Court finds beyond a reasonable doubt that Mr. Read acted because of his perception of the victim's race, at least in part.

The Court finds beyond a reasonable doubt that all of Mr. Read's acts were intentional.

The Court finds beyond a reasonable doubt that the acts were malicious; they were designed to vex, annoy or injure another.

The Court finds beyond a reasonable doubt that Mr. Read placed Ms. Zewdu in reasonable fear of harm to her person. She called 911 crying. She spoke to Brian Smith crying, trembling. She spoke to Mr. De Maria in the same manner.

Even the defense states, [w]ell, she felt that the reason he was trying to kill her was not because of her race; it was because of the parking ticket. Well, that statement tells me a whole lot about what she thought happened to her. She thought he was trying to kill her. Not just physically harm her, kill her.

The Court finds that she is a reasonable person, that the fear was reasonable.

The trial court also ruled:

This court finds that considering the totality of the statements and the acts, the acts that he got out of his car and went toward her with balled fists, getting directly in her face, the way he drove the car, and going after her as if she had stolen from him, combined with the verbal conduct, the escalating verbal conduct, the use of the N word many times, "I know where you work," "I don't give a damn about the cops," that the

accumulation of all of those are clearly an intent to intimidate the victim, put her in fear and threaten her.

¶18 The written findings and conclusions incorporate the court's oral ruling. The written findings and conclusions further state, in pertinent part:

Once Mr. Read saw Ms. Zewdu's physical appearance, he exited his truck to start a confrontation. The motivation for him getting out of the truck and starting a confrontation was based on his perception of Ms. Zewdu's race and national origin. He immediately used offensive racial epithets. It was then that he began approaching her aggressively and began making her feel immediate physical harm and eventually threatened her by the totality of his words and conduct of future harm.

. . . Although Mr. Read's reason for anger was because he was cited a ticket, his reason for anger switched to his perception of Ms. Zewdu's race, color, ancestry, or national origin as soon as he saw Ms. Zewdu. He threatened her because of her race, color, ancestry, or national origin.

¶19 The trial court sentenced Read to 30 days' confinement converted to 240 hours plus an additional 480 hours of community service. The court prohibited contact with Zewdu for five years and required Read to engage in anger management and diversity training. Read appeals his conviction of malicious harassment.

## ANALYSIS

¶20 Read argues the State did not prove beyond a reasonable doubt that he threatened Zewdu because of her race and the trial court erred in failing to determine whether Zewdu's race was the primary motivating factor.

¶21 Because the crime of malicious harassment implicates First Amendment rights, we must conduct " 'an independent examination of the whole record' " to assure the conviction " 'does not constitute a forbidden intrusion on the field of free expression.' " *State v. Kilburn*, 151 Wn.2d 36, 50, 84 P.3d 1215 (2004) (internal quotation marks

omitted) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)).

¶22 An independent review of the record is "not complete de novo review." *Kilburn*, 151 Wn.2d at 50-52. Review is limited to "those 'crucial' facts that necessarily involve the legal determination whether the speech is unprotected." *Kilburn*, 151 Wn.2d at 52. "Crucial facts" are those facts that are "so intermingled with the legal question as to make it necessary, in order to pass on the constitutional question, to analyze the facts." *Kilburn*, 151 Wn.2d at 51. An independent constitutionally based review requires us to give due regard "to the trial judge's opportunity to observe the demeanor of the witnesses" and the trial court's determination as to credibility. *Bose*, 466 U.S. at 499-500.

¶23 To convict Read of malicious harassment, the State must prove beyond a reasonable doubt that he maliciously and intentionally threatened Zewdu and placed her in fear of harm because of his perception of her race, ancestry, or national origin. RCW 9A.36.080. Words alone cannot constitute malicious harassment "unless the context or circumstances surrounding the words indicate the words are a threat" and it is apparent that the person can carry out the threat. RCW 9A.36.080(1)(c).

¶24 The intent of the malicious harassment statute is not to punish bigoted speech or thought, "but rather the act of victim selection." *State v. Talley*, 122 Wn.2d 192, 206, 858 P.2d 217 (1993).

> [T]he Legislature ensured that, absent criminal conduct, bigoted speech and thought are protected. A person is free under the statute to make his or her odious bigoted thoughts known to the world so long as those words do not cross the boundary into criminal harassment, assault, or property damage.

*Talley*, 122 Wn.2d at 211.

¶25 In *Talley*, the court held that the malicious harassment hate crime statute does not violate the First

Amendment because it "is aimed at criminal conduct and enhances punishment for that conduct where the defendant chooses his or her victim because of their perceived membership in a protected category." *Talley*, 122 Wn.2d at 201.[2] The court concluded that because the malicious harassment hate crime statute "regulates primarily conduct . . . , its effect on speech is minimal," and that the required nexus between the criminal conduct and speech ensures the statute does not violate First Amendment rights. *Talley*, 122 Wn.2d at 210-11. In analyzing the meaning of "because of" as used in the malicious harassment statute, the court held that "because of" means " 'by reason of' or 'on account of.' " *Talley*, 122 Wn.2d at 213 (quoting WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 131 (1968)).

¶26 Read contends that because the primary reason he confronted Zewdu was because she gave him a parking ticket, the First Amendment protects his use of racial slurs. Read claims that to convict him of malicious harassment, the court must find that racial motivation was the primary motivating factor or the proximate cause for selecting Zewdu as a victim.[3]

¶27 Read's argument that the court must find that Zewdu's race, color, national origin, or ethnicity was the primary motivating factor was considered in *State v. Pollard*, 80 Wn. App. 60, 906 P.2d 976 (1995). In *Pollard*, the defendant argued that "because of" means that the State must prove the victim's race was a "substantial factor" in order to convict under the malicious harassment statute.

---

[2] Because the malicious harassment statute punishes victim selection, the State does not need to prove preplanning.

> It is entirely conceivable that a person could be walking down the street, have a random encounter or confrontation with a member of a group he or she does not like and decide then and there to assault that person because of the victim's membership in the target group.

*State v. Pollard*, 80 Wn. App. 60, 66, 906 P.2d 976 (1995).

[3] Read relies on the trial court's statement that Read threatened Zewdu because of his perception of her race "at least in part" to argue the record does not support his conviction. But as noted, our review is an independent review of the record.

*Pollard*, 80 Wn. App. at 68. Relying on the Supreme Court's interpretation of the meaning of "because of" in *Talley*, we rejected the argument that absent a substantial factor requirement the statute was unconstitutionally vague, and held that it is not necessary "to read a substantial factor requirement into RCW 9A.36.080."[4] *Pollard*, 80 Wn. App. at 68-69. In reaching that conclusion, we also rejected Pollard's reliance on a California decision addressing a sentencing enhancement provision, *People v. Baker*, 35 Cal. App. 4th 1413, 25 Cal. Rptr. 2d 372 (1993):

> *Baker* is not persuasive here because the statutory scheme at issue there was a sentence enhancement provision, not a statute creating a separate substantive offense. Under our statute, the intent to harass or intimidate someone because of the person's status is an element of the crime, not an aggravating circumstance.

*Pollard*, 80 Wn. App. at 69-70.

¶28 In an attempt to distinguish *Pollard*, Read cites *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969) and *National Ass'n for Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) to argue that the State must prove racial bias is the primary motivating factor that caused him to threaten Zewdu. *Brandenburg* and *Claiborne* are distinguishable and do not support

---

[4] The out-of-state cases Read relies on to argue that a "substantial factor" is required are distinguishable and unpersuasive. In *In re M.S.*, 10 Cal. 4th 698, 719, 896 P.2d 1365, 42 Cal. Rptr. 2d 355 (1995), the court interpreted the language "because of" as used in a sentencing enhancement statute to mean "cause in fact." In *State v. Stalder*, 630 So. 2d 1072 (Fla. 1994), the Florida Supreme Court upheld a sentence enhancement statute if there was evidence of prejudice based on the race of the victim. The court concluded that the statute applied only to bias-motivated crime "wherein the perpetrator intentionally selects the victim because of the victim's 'race, color, ethnicity, religion, or national origin.' " *Stalder*, 630 So. 2d at 1077 (quoting former FLA. STAT. § 775.085 (1989)). In *State v. Mortimer*, 135 N.J. 517, 534-35, 641 A.2d 257 (1994), the New Jersey Supreme Court held that the language in a statute that required the State to prove bias was "at least in part" the motivation was unconstitutionally vague but could be cured by narrowly construing the statute to require choosing a victim "because of" race or other protected characteristics.

Read's argument. Neither *Brandenburg* nor *Claiborne* address the question of whether the State must prove that racial bias was the primary motivating factor to convict under the malicious harassment statue, RCW 9A.36.080.

¶29 In *Brandenburg*, the Supreme Court reversed the conviction of a Ku Klux Klan member convicted under the Ohio criminal syndicalism statute for expressing derogatory views about African Americans and Jews and the possibility of revenge by the " 'white, Caucasian race.' " *Brandenburg*, 395 U.S. at 445-47. The Supreme Court struck down a criminal syndicalism statute that punished " 'advocat[ing] . . . sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform' and for 'voluntarily assembl[ing] . . . to teach or advocate the doctrines of criminal syndicalism.' " *Brandenburg*, 395 U.S. at 444-45 (quoting former OHIO REV. CODE ANN. § 2923.13 (1953)). The Court held that a statute that fails to draw a distinction between advocating the use of force and advocacy "directed to inciting or producing imminent lawless action . . . likely to incite or produce such action" violates the First Amendment. *Brandenburg*, 395 U.S. at 447-48.

¶30 In *Claiborne*, the Supreme Court reversed entry of a joint and several judgment against African American defendants for damages owed to Caucasian merchants for business losses from a boycott. *Claiborne*, 458 U.S. at 915. The Court held that the defendants were entitled to protection under the First Amendment for engaging in the nonviolent boycott.

> While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered.

*Claiborne*, 458 U.S. at 918.

¶31 Read also argues the evidence does not establish beyond a reasonable doubt that he threatened Zewdu

"because of" her race and the trial court improperly considered his use of racial slurs in deciding that he was guilty of malicious harassment. We disagree.

¶32 In *Wisconsin v. Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993), the Supreme Court held that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Consistent with *Mitchell*, our Supreme Court in *Talley* also held that the defendant's statements may be used to prove malicious harassment.

> It is true that utterances by the defendant may offer circumstantial evidence of discrimination or victim selection, but as with employment discrimination, victim selection can be shown by a pattern of conduct absent any speech. Even if speech is used to prove victim selection, we can find no distinction between using speech to prove malicious harassment or any other crime. Only that speech relevant to proving the crime will be admitted. As is always the case, the trial judge will be required to balance the probative value of the evidence against the prejudice to the defendant. The State cannot simply produce evidence of bigoted beliefs. Before such evidence can be admitted, the State must establish the relationship between the speech and the act of victim selection. *See* [ER] 402, 403, 404; *accord, Mitchell*, 113 S. Ct. at 2200.

*Talley*, 122 Wn.2d at 211; *see also State v. Halstien*, 122 Wn.2d 109, 125, 857 P.2d 270 (1993).

¶33 Here, the record shows Read's words and conduct establish that he is guilty of intentionally and maliciously harassing Zewdu because of her race, ethnicity, or national origin. There is no question that Read was angry about the parking ticket, but that anger escalated and his behavior changed "as soon as he saw" Zewdu. While Read angrily asked the Caucasian male parking valet—" 'What is this? Who wrote this?' " he did not get out of his truck to confront him. By contrast, after Read saw Zewdu he immediately started using offensive racial epithets, got out of his truck,

confronted her in an aggressive manner, and repeatedly yelled at her, "You nigger, you gave me this fucking ticket." Read then advanced on Zewdu with a red face and clenched fists, "coming after" her and repeatedly calling her "nigger." Our independent review of the record supports the trial court's finding that "[a]lthough Mr. Read's reason for anger was because he was cited a ticket, his reason for anger switched to his perception of Ms. Zewdu's race, color, ancestry, or national origin as soon as he saw Ms. Zewdu. He threatened her because of her race, color, ancestry, or national origin."

¶34 Read relies heavily on Zewdu's testimony during cross-examination to assert that the record does not establish malicious harassment. Specifically, Read argues that Zewdu "thought that Read threatened her because she issued the ticket and not because she was Ethiopian." (Emphasis omitted.) The testimony Read relies on is taken out of context. Zewdu testified during cross-examination, in pertinent part:

Q. Do you remember speaking to Sergeant Robertson, the officer that came to the marina?

A. Yes.

Q. You told him this whole altercation started because of the parking ticket.

A. Yes.

Q. And you believed that Mr. Read wanted to kill you?

A. After he got the ticket, he came at me angry.

Q. And you thought because he was angry about the ticket that he wanted to kill you?

A. I didn't know what he was capable of doing.

Q. But he didn't tell you that he was going to kill you, right?

A. No.

Q. Okay. But you thought he wanted to kill you, but you thought he wanted to kill you because you had given him a parking ticket?

A. Yes.

Q.   Not because you were Ethiopian?

A.   No.

¶35  Further, Zewdu's belief that Read wanted to kill her because she gave him a parking ticket does not undermine the evidence at trial showing that Read threatened Zewdu because of her race.[5] Giving deference to the trial court's credibility determinations, we conclude based on our independent review that Read's statements and conduct establish he intentionally and maliciously threatened Zewdu because of her race.

¶36  In the alternative, Read argues there is insufficient evidence to support finding a "true threat" and the malicious harassment conviction. Read asserts there is no evidence that he intended to frighten Zewdu or place her in fear of bodily harm.

¶37  RCW 9A.36.080 provides, in pertinent part:

(1) A person is guilty of malicious harassment if he or she maliciously and intentionally commits one of the following acts because of his or her perception of the victim's race . . . :

. . . .

    (c) Threatens a specific person or group of persons and places that person, or members of the specific group of persons, in reasonable fear of harm to person or property. The fear must be a fear that a reasonable person would have under all the circumstances. For purposes of this section, a "reasonable person" is a reasonable person who is a member of the victim's race . . . . Words alone do not constitute malicious harassment unless the context or circumstances surrounding the words indicate the words are a threat. Threatening words do not

---

[5] Read also cites two Pennsylvania cases, *Commonwealth v. Ferino*, 433 Pa. Super. 306, 640 A.2d 934 (1994) and *Commonwealth v. Sinnott*, 976 A.2d 1184 (Pa. Super. Ct. 2009), in support of his argument that the evidence does not establish that he selected Zewdu as a victim because of her race. But the Pennsylvania statute prohibiting intimidation requires proof that the defendant was " 'motivated by hatred toward the race' " of the victim and the Pennsylvania court requires proof that racial hatred is the primary reason for victim selection. *Ferino*, 433 Pa. Super. at 309-10 (quoting 18 PA. CONS. STAT. ANN. § 2710(c)).

constitute malicious harassment if it is apparent to the victim that the person does not have the ability to carry out the threat.

¶38 In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. *Salinas*, 119 Wn.2d at 201. Further, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201.

¶39 It is well established that the First Amendment does not protect "true threats." *Kilburn*, 151 Wn.2d at 43; *State v. J.M.*, 144 Wn.2d 472, 477-78, 28 P.3d 720 (2001). The speaker of a true threat need not actually intend to carry out the threat. *Kilburn*, 151 Wn.2d at 46. Our Supreme Court defines a "true threat" as

> "a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person."

*State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (quoting *Kilburn*, 151 Wn.2d at 43 (quoting *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001))).

¶40 Citing to the Supreme Court's definition of "true threat" in *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) and the Ninth Circuit decision in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), Read claims no evidence supports finding a true threat in this case.

¶41 In *Black*, the Court held that a Virginia statute prohibiting cross burning did not violate the First Amendment. Based on a "long and pernicious history" establishing cross burning as "a signal of impending violence," the Court

held that cross burning constitutes a true threat not protected by the First Amendment. *Black*, 538 U.S. at 344. In reaching that decision, the Court addressed the meaning of "true threat." The Court states that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. *Black* states, in pertinent part:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." [*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)]. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so.

*Black*, 538 U.S. at 359-60 (first alteration in original) (citations omitted).

¶42 In *Cassel*, the Ninth Circuit concluded that the definition of "true threat" in *Black* "embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to threaten the victim." *Cassel*, 408 F.3d at 631 (emphasis omitted). The court held that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Cassel*, 408 F.3d at 633.

¶43 But in *United States v. Romo*, 413 F.3d 1044, 1051 (9th Cir. 2005), another panel of the Ninth Circuit did not

follow *Cassel*, and instead used an objective definition of "true threat" in determining whether the defendant's statement was a true threat. The court in *Romo* concluded that the decision in *Cassel* did not change the reasonable person analysis used to analyze true threats. *Romo*, 413 F.3d at 1051 n.6; *see also United States v. Stewart*, 420 F.3d 1007, 1018-19 (9th Cir. 2005); *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008).[6]

¶44 Here, sufficient evidence supports the finding that Read made a "true threat" under either the definition in *Black* or an objective speaker standard.[7] Using the definition in *Black*, the evidence shows that Read meant to communicate "a serious expression of an intent" to place Zewdu in fear of bodily harm. *Black*, 538 U.S. at 359. Read repeatedly and angrily used racial slurs to attack Zewdu while continuing to advance toward her. After driving over to Zewdu in an aggressive manner, Read got out of his truck and immediately started hurling racial epithets at Zewdu. Read's fists were clenched and he yelled, "You nigger!" and "You fucking Ethiopian!" as he came at Zewdu. He moved very close to Zewdu in order to physically intimidate her. When Zewdu told Read that she was going to call the police, he told her, " 'I don't care about fucking cops. . . . I know where you work,' " clearly communicating "a serious expression" of an intent to harm Zewdu.

¶45 Further, the trial court rejected Read's implausible claim that he did not intend to threaten Zewdu and the only reason he got out of his truck was because "it was the

_____

[6] The circuits are split on how to interpret *Black*. *See United States v. Magleby*, 420 F.3d 1136 (10th Cir. 2005) (a statement qualifies as a true threat only if the speaker subjectively intended it as a threat); *United States v. Cope*, 283 F. App'x 384, 2008 WL 2630366, 2008 U.S. App. LEXIS 14839 (6th Cir.) (unpublished opinion); *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 479 (S.D.N.Y. 2006) (interpreting *Black* to require only that the speaker knowingly made the statement, not subjectively intended it as a threat); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 617 (5th Cir. 2004).

[7] In *Schaler*, our Supreme Court noted the decision in *Black* but did not address the question of whether a true threat requires a subjective or objective standard. *Schaler*, 169 Wn.2d at 287.

proper thing to get out and greet somebody that is walking towards you," as not credible. Sufficient evidence supports the determination that Read meant to communicate a serious expression of intent to harm Zewdu.

¶46 The evidence also supports finding that a reasonable person in Read's position would foresee that Zewdu would interpret his statements as a serious expression of intent to cause her physical harm under the reasonable person standard. Viewing the evidence in the light most favorable to the State, Read's words and conduct establish his "intent to intimidate the victim, put her in fear and threaten her."

¶47 We affirm.

DWYER, C.J., and SPEARMAN, J., concur.

Reconsideration denied October 19, 2011.