
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 JAN 21  AM 9: 24

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) No. 69248-8-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| MICHAEL THANH DONERY, | ) UNPUBLISHED OPINION |
| | ) |
| Appellant. | ) FILED: January 21, 2014 |
| | ) |

LEACH, C.J. — Michael Donery appeals his conviction for one count of malicious harassment, alleging insufficient evidence and instructional error. Based on our independent review of the record, we conclude it includes evidence sufficient to establish that Donery threatened a corrections officer because of her race and that his communications constituted a "true threat." Donery fails to demonstrate any error in the challenged instructions, and the arguments in his statement of additional grounds are without merit. We affirm.

## FACTS

In March 2012, Michael Donery was incarcerated in Four North, a maximum security unit at the Snohomish County Jail. Each of the single-inmate cells in Four North has a metal door with a window at a height of about five feet and a combined

food slot and cuff port. Ventilation slots in the door permit corrections officers to communicate with the inmates without opening the door.

Inmates in Four North are permitted out of their cells for recreation for one hour per day and are not allowed to have direct contact with other inmates. Inmates may have only a limited amount of clothing and personal items in the cells.

On March 8, 2012, Corrections Deputy Shari Sigh was working the swing shift in Four North. Officer Sigh is black; the other corrections officers in the unit that evening were white.

At about 9:30 p.m., Sigh noticed Donery wearing vinyl gloves and wiping down the cell wall with a rag. Donery, who was not permitted to have these items, repeatedly refused to tell Sigh where he had gotten them. When Sigh directed Donery to give her the gloves and rag, he flushed them down the toilet. According to Sigh, inmates regularly cause flooding in the cells and adjacent areas by obstructing the toilets and then flushing.

Sigh called her supervisor. Sergeant Sweeney and Deputy Ray responded and moved Donery so that Sigh could search his cell. Donery had been in his new cell for less than five minutes when the toilet overflowed and water began flowing out of the cell.

Sigh requested the assistance of inmate workers, who cleaned up the water in the common areas but were not allowed into the occupied cells. The inmate workers returned after the toilet in Donery's cell overflowed a second time. The inmate workers finished cleaning up shortly before Sigh's shift ended at midnight. By 11:00 a.m. on the following morning, maintenance workers had discovered the source of the blockage and determined that it was caused by other inmates.

Almost immediately after his toilet overflowed for the first time, Donery began complaining that Sigh was keeping him in a wet cell and yelling threats and racial insults at her. Donery threatened to obtain personal information about Sigh, including her home address and work schedule. He also threatened to terrorize and kill her and her children. The threats continued virtually uninterrupted until Sigh left at the end of her shift. Sigh found the threats "overwhelming" and feared that Donery would be able to carry them out.

Sergeant Bernard Moody, the unit supervisor for the graveyard shift, began work at midnight. Moody heard Donery yelling and went to investigate. By the early morning hours of March 9, Moody had confirmed the presence of water in Donery's cell and arranged for him to be moved to a dry cell. Donery did not direct any racial insults at Moody, who is African American.

Sigh returned to Four North for her shift on the afternoon of March 9. As she walked by Donery's cell, he resumed yelling racial insults and threats to kill her. For purposes of her report, Sigh wrote down the statements that Donery yelled at her during the course of the evening:

> White power. Nigger. Nigger bitch. Hang from the noose. Heil Hitler. Karma is a bitch. I'm going to terrorize your nigger ass all night. I hate niggers. If you ain't white, you ain't right. If I got to stir shit up, I'm going to stir shit up. I'll knock her nigger ass out. Fuck that nigger bitch. I'm going to get your license plate and your address. I know people in the DMV. How do you like that, nigger? Hostile workplace, nigger bitch. Get off the tier, nigger bitch. I'm going to terrorize that nigger. Bug-eyed nigger bitch. That nigger bitch going to get smashed. You're going to get yours, nigger. It's a matter of Goddamn time. Fat-ass jiggaboo. Shit nigger bitch.

Donery made similar comments to several jail employees and complained that Sigh had left him in "shit water." Maria Moore, a classifications counselor, found Donery highly agitated and pacing back and forth in his cell. He was yelling,

> [K]eep that nigger bitch away from me. I don't care if I get another charge. You know, people—that nigger bitch disrespected me by putting me in a cell with shit water. That gets people killed in prison. . . . I don't care if I get another charge. I'll kill that nigger bitch for disrespecting me. That nigger bitch pushes my buttons. . . . I hate niggers.

Corrections Deputy Chad Matthews heard Donery yell the following comments:

> Fuck that nigger bitch Sigh. I know people on the outside. I'm going to get your first name and that's all I'll need. Technology is a bitch. Please charge me. I will get your first and last names on it. And that's

all I will need. I will have every last pig's names. Tell that sergeant to charge me. Houses, homes, families. That ain't no threat. That's a motherfucking promise. Burn them niggers. Check my record for custodial assaults. I don't fuck around. You guys don't know who you're fucking with. I stabbed a nigger on the streets in the fucking chest. Bug-eyed nigger bitch. These guys done fucked with the wrong motherfucker. Your Goddamn ugly-ass bug-eyes nigger bitch. I've done 15 years. I don't fucking care. Fat-ass jiggaboo nigger shit nigger bitch. They have nigger kids and shit, you know. I'll have your first and last name Sigh. Two websites and I will have your shit, you dumb nigger bitch. These fuckers are dumb. They park out by the courthouse in the parking garage and right below us here. Why are you supporting that nigger bitch?

Sergeant Bates contacted Donery to determine why he was yelling. Donery calmly explained his hatred of blacks to Bates. When Bates disagreed with Donery's theories, Donery resumed screaming racial epithets directed at Sigh. As Bates walked away, Donery warned him "to keep Sigh away from him, otherwise he was going to assault her, beat her up." When Bates replied that Sigh would be going wherever she needed to, Donery added, "Well, Bates, if she comes near me, the custodial assault will be on you."

Sigh felt "[t]errorized" and "very, very overwhelmed" by Donery's insults and threats and his intention to track down her address. She believed that "he would make good on what he said he was going to do." Donery did not direct threats or racially derogatory comments at any other corrections officers on March 9.

The State charged Donery with two counts of malicious harassment, one for the incident on March 8, 2012 (count I), and one for the incident on March 9, 2012

-5-

No. 69248-8-I / 6

(count II).  The jury acquitted Donery on count I and found him guilty as charged on count II.

ANALYSIS

Sufficiency of the Evidence

Donery challenges the sufficiency of the evidence to support his conviction for malicious harassment.  He argues the State failed to prove that he threatened Deputy Sigh because of her race or that his speech constituted a "true threat."

Because the crime of malicious harassment implicates First Amendment rights, an appellate court must undertake an independent examination of the entire record to ensure that the conviction "does not constitute a forbidden intrusion into the field of free expression."[1]  But our independent review involves only "crucial facts, that is, those facts so intermingled with the legal question that it is necessary to analyze them in order to pass on the constitutional question."[2]  We defer to the trier of fact on matters of credibility.[3]

In order to convict Donery of malicious harassment, the State must prove that he threatened Deputy Sigh "because of"[4] his perception of her race or color.  He

---

[1] State v. Locke, 175 Wn. App. 779, 790, 307 P.3d 771 (2013), petition for review filed, No. 89310-1 (Wash. Sept. 25, 2013).
[2] Locke, 175 Wn. App. at 790.
[3] State v. Johnston, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).
[4] RCW 9A.36.080(1).

-6-

argues that the evidence established only that he was angry because Sigh left him in an unsanitary cell.

Although Donery initially became angry when Sigh failed to move him to a different cell on the evening of March 8, 2012, Sergeant Moody arranged a dry cell for him during the early morning hours of March 9. Consequently, when Sigh arrived for her shift at 4:00 p.m., Donery had been in a dry cell for a substantial amount of time. Nonetheless, he immediately resumed yelling physical threats at Sigh. The relentless stream of racial epithets that accompanied Donery's threats and the fact he did not direct similar threats to white corrections officers constituted circumstantial evidence that racial bias motivated his threats.[5]

Citing State v. Read,[6] Donery argues that the evidence was insufficient because he did not accompany his words with aggressive physical gestures or movements. In Read, the court concluded that the defendant's racial epithets, accompanied by his aggressive physical confrontation, were sufficient to establish that he threatened the victim "because of" her race.[7] But although the relevant

---

[5] State v. Johnson, 115 Wn. App. 890, 898, 64 P.3d 88 (2003) (defendant's slurs and threats were circumstantial evidence of gender bias); see also State v. Talley, 122 Wn.2d 192, 211, 858 P.2d 217 (1993) ("utterances by the defendant may offer circumstantial evidence of discrimination or victim selection").

[6] 163 Wn. App. 853, 261 P.3d 207 (2011), review denied, 173 Wn.2d 1021 (2012), cert. denied, 133 S. Ct. 176 (2012).

[7] Read, 163 Wn. App. at 870.

evidence in Read included the defendant's statements and physical conduct, nothing in the court's analysis suggested that both words and conduct are required to establish victim selection. Donery's reliance on Read is therefore misplaced.

Because it acquitted Donery for the incident on March 8, the jury may well have accepted his claim that he was merely angry because Sigh did not move him to a dry cell. But the evidence was sufficient to permit a rational trier of fact to reject that explanation for Donery's actions on March 9 and find that he threatened Sigh because of his perception of her race or color.

Donery also contends that the State failed to prove that his communications to Sigh constituted a "true threat." To avoid violating the First Amendment, a statute criminalizing threatening language must be construed "as proscribing only unprotected true threats."[8] A true threat is "'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person."[9] Even if couched in the language of threats, communications are not true threats if they are in fact "merely jokes, idle talk,

---

[8] State v. Allen, 176 Wn.2d 611, 626, 294 P.3d 679 (2013).
[9] Allen, 176 Wn.2d at 626 (alteration in original) (internal quotation marks omitted) (quoting State v. Kilburn, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004)).

or hyperbole."[10] Words alone do not constitute malicious harassment "unless the context or circumstances surrounding the words indicate the words are a threat."[11]

Whether a statement constitutes a true threat necessarily rests on the specific facts and circumstances of the case.[12] The existence of a true threat does not depend on the subjective intent of the speaker.[13] "It is enough that a reasonable speaker would foresee that the threat would be considered serious."[14]

During the evening of March 9, Donery repeatedly made specific and personal threats to injure or kill Sigh. Donery communicated those threats not only to Sigh personally but also to several other jail employees. He identified the methods he would use to obtain the personal information about Sigh that would allow him to track her down and carry out the threats, including the possible assistance of persons outside the jail. Donery further underscored the seriousness of his threats by alleging that he had previously stabbed a person and that he was not concerned about any additional incarceration after he carried out the threats.

---

[10] State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010).
[11] RCW 9A.36.080(1)(c).
[12] See State v. C.G., 150 Wn.2d 604, 611, 80 P.3d 594 (2003).
[13] See Kilburn, 151 Wn.2d at 48.
[14] Schaler, 169 Wn.2d at 283.

In State v. Kilburn,[15] cited by Donery, the defendant told an acquaintance that he was going to bring a gun to school "'and shoot everyone and start with you.'" In concluding that a reasonable person would not foresee that the alleged victim would interpret the statement as a serious threat, the court relied primarily on

> [the defendant's] past relationship [with the alleged victim], his having joked with her and his other friend in the class before, the discussion that had been taking place about the books they were reading and his laughing or giggling when he made the comments.[16]

Here, unlike Kilburn, Donery and Sigh did not have a lengthy, amicable past relationship that suggested Donery was merely joking.

Donery contends no reasonable person could have taken his threats seriously because he had no ability to carry them out from his maximum security jail cell.[17] Although the general movement of inmates in Four North is restricted, Donery retained his privileges to receive visitors. In addition, the evidence established that inmates could grab and assault custodial staff when the cuff ports were opened to serve the food trays. Some inmates would throw water, urine, or other materials at officers through the ports. At one point during his tirade, Donery announced that he

---

[15] 151 Wn.2d 36, 39, 84 P.3d 1215 (2004).

[16] Kilburn, 151 Wn.2d at 53.

[17] See RCW 9A.36.080(1)(c) ("Threatening words do not constitute malicious harassment if it is apparent to the victim that the person does not have the ability to carry out the threat.").

-10-

was "notorious for shit-bombing," a practice that involved the throwing of feces and urine.

Consequently, despite the tight security in Four North, significant opportunities remained for inmates to contact and assault jail staff and to arrange for outside assistance to carry out threats. Under the circumstances, a reasonable person in Donery's position would foresee that Deputy Sigh would interpret his statements as a serious threat to cause her physical harm. The evidence was therefore sufficient to establish a "true threat."

Jury Instructions

Donery contends that the trial court committed reversible error when it modified a proposed instruction to reduce the State's burden of proving every element of malicious harassment. He argues that instruction 12 was defective because it referred only to the requirement that the defendant act intentionally. Because malicious harassment requires proof that the defendant acted both intentionally and maliciously, he claims that the instruction effectively eliminated the State's burden to prove a necessary element. We disagree.

Relying on State v. Talley,[18] defense counsel proposed the following instruction: "The intent of the malicious harassment statute is not to punish bigoted

_____

[18] 122 Wn.2d 192, 206, 858 P.2d 217 (1993).

speech or thought, but rather th[e] act of victim selection." The trial court rejected the proposed instruction as written but gave a revised version: "The malicious harassment statute punishes not bigoted speech or thought, but rather those defendants who act with an intent to target a person because of that person's race or color." Defense counsel acknowledged that the court's revised instruction "[said] basically the same thing . . . [i]n different language" but maintained that the proposed instruction was "clearer."

"We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole."[19] An instruction that relieves the State of proving every element of the charged offense requires automatic reversal.[20]

Donery does not dispute that instruction 13, the "to convict" instruction, set forth all of the elements of malicious harassment, including the requirement that "the defendant acted maliciously and intentionally." Separate instructions defined "maliciously" and "intentionally." Nothing in instruction 12 purported to modify in any manner the State's burden of proving all of the elements in the "to convict" instruction. Viewed in their entirety, the instructions did not relieve the State of its burden to prove that Donery acted maliciously.

---

[19] State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995).
[20] State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002).

Donery's contention that instruction 9 reduced the State's burden of proof is equally unpersuasive. The State was required to establish that Donery threatened Sigh "because of [his] perception of her race or color."[21] Instruction 9 provided,

"Because of" means "by reason of."

There may be multiple reasons for a defendant's acts. The defendant's perception of the person's race or color need not be the only or primary reason, but it must be proved to be a reason without which the defendant's acts would not have happened.

Defense counsel proposed the first paragraph of the instruction but objected when the trial court added the second paragraph.

Donery contends that the second paragraph reduced the State's burden of proof by permitting the jury to convict him even if it found that his perception of Sigh's race was only one of several reasons for his actions. But Donery cites no relevant authority for the proposition that race must be the defendant's sole reason for selecting a target. In construing the "because of" requirement of RCW 9A.36.080(1), this court has expressly rejected contentions that racial motivation must be "the primary motivating factor"[22] or "at least a substantial factor"[23] for the defendant's conduct. Donery fails to identify any error in instruction 9.

---

[21] RCW 9A.36.080(1).
[22] Read, 163 Wn. App. at 865-66.
[23] State v. Pollard, 80 Wn. App. 60, 68, 906 P.2d 976 (1995).

Statement of Additional Grounds for Review

In his statement of additional grounds for review, Donery contends that the deputy prosecutor committed misconduct by eliciting testimony that he was currently incarcerated in jail. He also claims that defense counsel was constitutionally deficient for failing to object to the testimony.

In order to convict Donery of malicious harassment, the State was required to prove, among other things, that his threats placed Deputy Sigh in reasonable fear of harm.[24] Sigh testified that she felt "terrorized" and "overwhelmed" by Donery's threats. During extensive cross-examination, defense counsel brought out the fact that for the most part, Donery remained incarcerated in the same high security jail unit after the incident. Sigh acknowledged that Donery's movements were highly restricted in the jail and that she continued to work in the same unit and did not change anything about her "life-style."

Defense counsel's references to Donery's continued incarceration were clearly an integral part of the defense's attempt to impeach Sigh's claim of ongoing fear. Because defense counsel's decision not to object to evidence of Donery's incarceration was a legitimate trial strategy, it cannot support a claim of ineffective

---

[24] RCW 9A.36.080(1)(c).

assistance.[25] Under the circumstances, the deputy prosecutor's reference to Donery's incarceration was not misconduct.

Donery also contends that the trial court erred in ruling that his statements to Snohomish County Deputy Sheriff Marcus Dill were voluntary and admissible. Donery argues that he was clearly in custody in a jail cell and that Dill was therefore required to advise him of his Miranda[26] rights before asking him any questions.

Following a CrR 3.5 hearing, the trial court ruled that Donery's statements to Dill were voluntary and admissible without Miranda warnings. Dill then testified about his brief encounter with Donery on the evening of March 8, 2012.

Donery fails to identify the statements that were erroneously admitted or explain how their admission prejudiced his defense. Moreover, Dill testified only about his encounter with Donery on March 8, 2012. The jury acquitted Donery of the

---

[25] State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).
[26] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

offense that allegedly occurred on March 8. Under the circumstances, Donery has not provided any meaningful basis for this court to review the alleged error.[27]

Affirmed.

_Leach, C.J._

WE CONCUR:

_Spearman, J._          _Appelwick, J._

---

[27] See RAP 10.10(c) (appellate court will not consider statement of additional grounds for review "if it does not inform the court of the nature and occurrence of alleged errors").