[No. 36803-0-II.   Division Two.   January 13, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. JESSIE L. HOVIG, *Appellant*.

*Nancy P. Collins* and *Vanessa Mi-jo Lee* (of *Washington Appellate Project*), for appellant.

*H. Steward Menefee, Prosecuting Attorney*, and *Gerald R. Fuller, Deputy*, for respondent.

¶1 HUNT, J. — Jessie Hovig appeals his bench trial conviction and exceptional sentence for second degree assault of a child. Hovig argues that (1) the trial court erred in failing to enter findings of fact on the "recklessly inflicts" element of the crime, (2) the evidence was insufficient to support the trial court's finding that Hovig "recklessly" inflicted "substantial bodily harm," and (3) the trial court abused its discretion in imposing an exceptional 60-month sentence. We affirm.

## FACTS

### I. CHILD ASSAULT

¶2 On April 23, 2006, Jessie Hovig was caring for his four-month-old son, MH, while MH's mother, Hope Forbes,

went shopping with her sister and mother. Forbes left MH alone with Hovig for approximately an hour and a half. During a diaper change, Hovig caught MH as he was falling from a bed, scratching MH's back and stomach. After the diaper-changing incident, Hovig intentionally bit the baby's face, leaving a large, mouth-shaped bruise covering MH's right cheek. According to Hovig, he caused the injury by playing "rabid dog," a game in which he would growl at MH and "basically chew on the side of the baby's face." Report of Proceedings (RP) at 13.

¶3 After noticing the bruise, Hovig called Forbes and told her about leaving a mark that resembled a "hickey" on MH. Forbes put Hovig on speaker phone so that her mother and sister could hear what he described. According to Forbes's mother, Hovig giggled inappropriately while he described the incident. Hovig also concealed the baby's bruise with makeup so that Forbes would not yell at him when she returned.

¶4 Forbes returned home immediately with her sister and mother. They put MH in the car and intended to take him to the sister's home. Once in the car, Forbes's sister wiped off the makeup, revealing a bright red, mouth-shaped bite mark covering MH's right cheek. Shocked, Forbes's sister immediately took pictures of the bruise with a camera phone. They stopped at Wal-Mart to ask Forbes's sister's husband what he thought they should do about the injury. He advised them to call the police and to take the baby to the hospital.

¶5 When they arrived home, Forbes's sister called the police. Officer Jon Hudson responded, observed the bruising and discoloration on MH's face, and retrieved his patrol camera to document the injury. Hudson's photos depict a mouth-shaped injury that begins at the base of MH's jaw bone and circles up to the top of his right cheekbone. Individual red and violet teeth-marks line the upper and lower circumference of the injury. MH's entire right cheek is colored with yellow-brown bruising. Hudson noted that this

large left-cheek bruise appeared to darken in color as he conducted his investigation.

¶6 Hudson's photos also show a second, bright red bruise mark on MH's left check, approximately the size of a quarter, and scratch marks on MH's back and stomach.

¶7 That evening, Forbes, her mother, and her sister took MH to the hospital. The next day, Doctor W. S. Hutton examined MH, and described MH's injury as a teeth-mark bruise from an adult bite. Although the bite had not broken the skin, Dr. Hutton concluded that the injury likely caused the infant pain and discomfort, and that the bruising would persist for 7 to 14 days.

## II. PROCEDURAL FACTS

¶8 The State charged Hovig with assault of a child in the second degree under RCW 9A.36.130(1)(a). The parties stipulated to a bench trial.

¶9 During trial, Forbes's sister testified that when she and Forbes had returned home after Hovig's call, he had shown her only the smaller mark on the baby's left cheek, saying, "It's not all that bad, just a little red mark." RP at 36. But when Forbe's sister got into the car to leave, she noticed the makeup on MH's right cheek. When she cleaned off the makeup, she was shocked to discover the much larger injury on the baby's right cheek. Forbes's sister further testified, "He [(Hovig)] didn't even mention there was something on the other side until we noticed it." RP at 38.

¶10 Denying that he pointed out only the smaller bite mark, Hovig testified that he had immediately pointed out the larger bruise on MH's right cheek and had shown Forbes where he had applied the makeup to the baby's cheek. Hovig further claimed that he had bruised the baby by accident, testifying that (1) he had played "rabid dog" with MH in the past, (2) he had not been thinking when he left the bruise, and (3) he felt ashamed for having caused this injury.

¶11 Forbes, Forbes's sister and mother, Officer Hudson, and Dr. Hutton testified about the nature and extent of MH's bite-mark injury. Dr. Hutton also testified that MH likely experienced pain when the injury occurred and that the bruise would last from 7 to 14 days. In addition to verbal descriptions of the injury, the State introduced the photographs of the injury that Hudson had taken, and the picture Forbes's sister had taken with her cell phone. All the photos depict a large, red, teeth-marked bruise covering MH's right cheek.

¶12 The trial court found Hovig guilty as charged. The trial court then entered its findings of fact, including that (1) Hovig had bitten MH on the cheek, which caused the injury, and (2) because Hovig was MH's father, he knew that the child was young, particularly vulnerable, and incapable of resistance. Based on these facts, the trial court entered conclusions of law that Hovig had intentionally assaulted MH and recklessly inflicted substantial bodily harm.

¶13 Although Hovig's criminal record contained prior juvenile adjudications, his adult offender score was zero, yielding a standard sentencing range of 31-41 months of confinement. The State recommended an exceptional sentence of 53 months because Hovig had intentionally injured an especially young and vulnerable child. The trial court imposed an exceptional 60-month sentence because of MH's young age and vulnerability.

¶14 Hovig appeals his conviction and exceptional sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

¶15 Hovig contends that the State failed to provide sufficient evidence to prove beyond a reasonable doubt that he was guilty of second degree assault of a child. A person commits second degree assault when that person "[i]nten-

tionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a). A person commits assault of a child in the second degree when a person commits the crime of assault in the second degree, as defined above, on a victim who is less than 13 years old. RCW 9A.36.130, .021(1)(a). Specifically, Hovig argues that the evidence was insufficient to prove beyond a reasonable doubt that he (1) "recklessly" inflicted (2) "substantial bodily harm," as described under RCW 9A.36.021(1)(a). We disagree.

### A. Standard of Review

■ ¶16 We review a trial court's decision following a bench trial to determine whether substantial evidence supports any challenged findings and whether the findings support the conclusions of law. *State v. Carlson*, 143 Wn. App. 507, 519, 178 P.3d 371 (citing *Dorsey v. King County*, 51 Wn. App. 664, 668-69, 754 P.2d 1255, *review denied*, 111 Wn.2d 1022 (1988)), *review denied*, 164 Wn.2d 1026 (2008).

■ ■ ¶17 In a criminal case, the State must provide sufficient evidence to prove each element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Teal*, 152 Wn.2d 333, 337, 96 P.3d 974 (2004); *State v. Salinas*, 119 Wn.2d 192, 829 P.2d 1068 (1992).

> The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980).

*Salinas*, 119 Wn.2d at 201.

B. "Recklessly Inflicts"

¶18 RCW 9A.08.010(1)(c) defines "reckless conduct" as follows:

> A person is reckless or acts recklessly when he knows or disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation.

This definition contains both a subjective and an objective knowledge component. *State v. Keend*, 140 Wn. App. 858, 869, 166 P.3d 1268 (2007) (citing *State v. R.H.S.*, 94 Wn. App. 844, 847, 974 P.2d 1253 (1999)), *review denied*, 163 Wn.2d 1041 (2008). Determining whether a defendant acted recklessly depends on what that defendant knew and how a reasonable person would have acted knowing the same facts. *Keend*, 140 Wn. App. at 869. Additionally, the trier of fact may find actual subjective knowledge based on information that would lead a reasonable person to believe that a fact exists. *Keend*, 140 Wn. App. at 869.

¶19 Hovig concedes that he intentionally bit MH. But he argues that the State did not produce sufficient evidence to prove that he "recklessly" inflicted the resulting injury because the State allegedly failed to prove that he actually *knew* that biting MH would risk causing substantial harm. In support of this argument, Hovig points to his testimony at trial that he did not intend to harm MH, but only to play a game with him. When asked what he had been thinking at the time, Hovig replied, "Obviously I wasn't really thinking nothing. I did not think that anything would happen." RP at 47.

¶20 In terms of Hovig's subjective knowledge, sufficient evidence supports the trial court's finding that Hovig knew that MH was vulnerable and that roughhousing would pose a substantial risk of harm to MH. Because he was MH's

father and he had lived with MH for at least two months, Hovig had special insight into MH's young age and vulnerability. For example, when asked about the scratches on MH's stomach, Hovig testified that, during a diaper change, "[MH] was falling, and I caught him, and I scratched him up," RP at 46; thus, Hovig knew from this actual experience that infant MH was especially vulnerable to injury. Moreover, Hovig felt ashamed by his actions, which suggests that he was aware of the risk of harm but chose to "play" roughly with MH anyway.

¶21 From an objective standpoint, Hovig acted recklessly by engaging in conduct that a reasonable person would view as dangerous to an infant. Based on MH's very young age, a reasonable person would avoid rough physical contact, including wide-open-mouth biting forceful enough to leave a bite mark that covered the baby's whole cheek. A reasonable person would also exercise extra caution with MH after recognizing that he (Hovig) had scratched the infant on his back and stomach while simply changing his diaper. Hovig, however, failed to act as a reasonable person would act under these circumstances.

¶22 Reviewing the facts and drawing reasonable inferences in favor of the State, as we must, we hold that sufficient evidence supports the trial court's finding that Hovig acted intentionally when he bit MH, in spite of being aware of MH's young age and vulnerability. These findings, in turn, support the trial court's conclusion of law that Hovig acted unreasonably and recklessly while caring for MH.

## C. "Substantial Bodily Harm"

¶23 To convict a defendant of second degree assault of a child, the State must also prove beyond a reasonable doubt that the defendant inflicted "substantial bodily harm." RCW 9A.36.130, .021(1)(a). Hovig argues that the evidence presented at trial was insufficient to prove "substantial bodily harm" beyond a reasonable doubt. To sup-

port this argument, Hovig contends that the State failed to provide sufficient evidence that MH's injury rose to the level of *substantial* bodily harm as RCW 9A.36.021 requires. We disagree.

¶24 In his briefing, Hovig explores the evolution of Washington's second degree assault statute to analyze the meaning of "substantial bodily harm." Ch. 9A.36 RCW. Hovig compares the previous version of the second degree assault statute, RCW 9.11.020 (since repealed by Laws of 1975, ch. 260, effective July 1, 1976) and *State v. Miles*, 77 Wn.2d 593, 464 P.2d 723 (1970), decided under that former statute, to the current version of the statute found in RCW 9A.36.021(1)(a). Before 1986, Washington's second degree assault statute included the phrase *"grievous* bodily harm." Laws of 1986, ch. 257, § 5 (emphasis added) (amending second degree assault to include *"substantial* bodily harm" and codifying second degree assault under RCW 9A.36.021 (emphasis added)). In *State v. Salinas*, our Supreme Court examined the definition of "grievous bodily harm" that the trial court used in the jury instructions. 87 Wn.2d 112, 121, 549 P.2d 712 (1976). The *Salinas* court determined that the jury instructions adequately stated the law by defining "grievous" as (1) " 'a hurt or injury calculated to interfere with the health or comfort of the person injured' " and (2) " 'atrocious, aggravating, harmful, painful, hard to bear, [and] serious in nature.' " *Salinas*, 87 Wn.2d at 121.

¶25 The current statute, RCW 9A.04.110(4)(b), defines "substantial bodily harm" as a "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." This revised version of the statute no longer requires "pain" as an element of second degree assault.

¶26 Hovig argues that "the Legislature did not believe substantial pain, standing alone, was enough to convict a person for assault in the second degree." Br. of Appellant at 10. To support this proposition, he cites Laws of 1988, ch.

158, § 1, in which the legislature deleted the term "substantial pain" from the definition of "substantial bodily injury." Hovig then asserts that the current second degree assault statute requires a greater degree of injury (more than mere pain) than the former statute required. Hovig contends that (1) MH's right cheek bite-mark bruise constituted a lesser degree of injury than the cut and swollen lip that the victim suffered in *Miles*, (2) the current statute now requires a greater degree of injury and, therefore, (3) the State failed to produce sufficient evidence to prove that he caused MH "substantial bodily harm."

¶27 Hovig's analysis fails for two reasons. First, *Miles* did not hold that a cut and swollen lip could never constitute "grievous" bodily harm. *Miles*, 77 Wn.2d at 600. Instead, the Supreme Court reversed Miles's conviction for second degree assault because the State had failed to produce sufficient evidence to show that the injury was "grievous." *Miles*, 77 Wn.2d at 600. The *Miles* court reached that conclusion because (1) "[n]one of the witnesses was called upon to elaborate upon the nature, size, extent, or degree of the cut or the swollen lip," and (2) "[t]here was no testimony whatsoever as to any other bruises or contusions." *Miles*, 77 Wn.2d at 600-01.

¶28 Second, Division One of our court held in *State v. Ashcraft*, 71 Wn. App. 444, 455, 859 P.2d 60 (1993), that serious bruising can constitute "substantial" bodily harm when the State produces sufficient evidence to persuade the trier of fact that the bruising rises to the level of "substantial disfigurement." The jury found Ashcraft guilty of second degree assault for leaving bruise marks on a child after hitting the child with a shoe. *Ashcraft*, 71 Wn. App. at 450. Ashcraft then appealed her second degree assault conviction, arguing that the State had failed to produce sufficient evidence of "substantial bodily injury." *Ashcraft*, 71 Wn. App. at 454. After reviewing the medical testimony, the court disagreed with Ashcraft, stating, "[T]he presence of bruise marks indicates temporary but substantial disfigurement." *Ashcraft*, 71 Wn. App. at 455.

¶29 Additionally, *Ashcraft* is more instructive here than *Miles*, not only because *Ashcraft* is more factually analogous, but also because Division One decided *Ashcraft* under the same statutory language that applies here. *Ashcraft* also involved a bruise injury (as opposed to the cut and swollen lip in *Miles*). More importantly, *Ashcraft* analyzed the degree of injury under the current language of the second degree assault statute. The court noted that the legislature replaced the word "grievous" with the word "substantial" as the degree of injury necessary for second degree assault; then the court concluded that a bruise can be " 'temporary but substantial disfigurement.' " *Ashcraft*, 71 Wn. App. at 455 (quoting RCW 9A.04.110(4)(b)).

¶30 We agree with *Ashcraft* that serious bruising can rise to the level of "substantial bodily injury" if the State produces sufficient evidence of temporary but substantial disfigurement, as required under RCW 9A.36.021 and RCW 9A.04.110(4)(b). Here, as in *Ashcraft*, the State presented sufficient evidence of "substantial bodily harm." The State provided photographs of MH's injury taken hours after Hovig bit him. Dr. Hutton testified that MH would have experienced pain when the injury occurred and that the bruise would have lasted from 7 to 14 days. This persuasive photographic evidence and medical testimony not only fit squarely within the statutory definition of "substantial bodily harm," but also constitute the type of evidence that the Supreme Court found lacking in *Miles*. Here, in contrast to *Miles*, the evidence demonstrated that Hovig's rough play caused MH to suffer from substantial, although temporary, disfigurement. *See Salinas*, 87 Wn.2d at 121-22 (distinguishing *Miles* on quantity of evidence produced).

¶31 Accordingly, we hold that sufficient evidence supports the trial court's findings of fact, which in turn support the trial court's conclusion that Hovig recklessly inflicted substantial bodily harm on MH.

## II. Findings of Fact

¶32 Hovig next argues that the trial court failed to enter complete written findings of fact, as required under Criminal Rule 6.1, to support the conclusion that Hovig inflicted the injury "recklessly." This argument fails.

¶33 Contrary to Hovig's argument, the trial court's written findings of fact support the trial court's conclusion that Hovig "recklessly" inflicted substantial bodily harm on MH. Specifically, finding of fact 8 states, "[T]he defendant, during the time he was caring for the child, bit the child on the cheek causing the injuries observed by witnesses and Dr. Hutton." Clerk's Papers (CP) at 23. Finding of fact 9 states, "[T]he defendant, being the father of the child, *knew that the child, because of his age, was particularly vulnerable.*" CP at 24 (emphasis added). Based on these findings, coupled with the fact-based inference that Hovig knew the child was vulnerable but bit MH anyway, the trial court properly concluded that Hovig "recklessly inflicted substantial bodily harm on [MH]." CP at 24.

¶34 Accordingly, we hold that the trial court's findings of fact provided a sufficient factual basis to support its conclusion of law that Hovig "recklessly" inflicted the injury.

## III. Exceptional Sentence

¶35 Lastly, Hovig argues that the trial court abused its discretion in imposing an exceptional 60-month sentence. This argument similarly fails.

### A. Standard of Review

¶36 A trial court may impose a sentence outside the standard sentencing range if it finds that substantial and compelling reasons justify an exceptional sentence. RCW 9.94A.535. Under RCW 9.94A.585, appellate courts may review an exceptional sentence to ensure that (1) substan-

tial evidence supports the trial court's reasons for imposing the sentence; (2) the reasons, as a matter of law, justify a departure from the standard range; and (3) the trial court did not abuse its discretion in sentencing the defendant too excessively or too leniently. *State v. Ferguson*, 142 Wn.2d 631, 646, 15 P.3d 1271 (2001).

¶37 We review an exceptional sentence under the abuse of discretion standard. *State v. Law*, 154 Wn.2d 85, 93, 110 P.3d 717 (2005). A trial court abuses its discretion with regard to sentencing length in two ways: (1) by relying on an impermissible reason; or (2) by " 'impos[ing] a sentence which is so long that, in light of the record, it shocks the conscience of the reviewing court.' " *State v. Ritchie*, 126 Wn.2d 388, 396, 894 P.2d 1308 (1995) (quoting *State v. Ross*, 71 Wn. App. 556, 571-72, 861 P.2d 473 (1993), *review denied*, 123 Wn.2d 1019 (1994)). Significantly, the sentencing court need not articulate reasons for the length of the sentence. *See Ritchie*, 126 Wn.2d at 395.

## B. No Abuse of Discretion

¶38 We analyze Hovig's arguments under the third prong of the RCW 9.94A.585 test to determine whether the trial court abused its discretion in imposing an exceptional sentence. Hovig asks us to disregard the *Ritchie* majority and to conclude that the trial court abused its discretion in failing to explain fully why it sentenced Hovig to 60 months of confinement. Not only are we bound by the majority decision in *Ritchie*, but also the Washington State Supreme Court has since reaffirmed *Ritchie* in *Ferguson*, 142 Wn.2d at 651; *see also State v. Burkins*, 94 Wn. App. 677, 973 P.2d 15 (rejecting appellant's request to disregard *Ritchie*), *review denied*, 138 Wn.2d 1014 (1999).

¶39 Hovig also contends that the trial court's failure to set forth reasons for the length of the sentence renders the decision unreviewable. Contrary to Hovig's assertion, the trial court did provide reasons for imposing an exceptional sentence. In its final order, the trial court

stated that it sentenced Hovig to 60 months confinement because as an infant, MH was particularly vulnerable. Furthermore, RCW 9.94A.535(3)(b) expressly permits the trial court to exceed the standard range based on the victim's vulnerability. Here, the trial court explicitly found, "The defendant, being the father of the child, knew that the child, because of his age, was particularly vulnerable and incapable of resistance." CP at 23. In light of the facts of this case, particularly the baby's young age and vulnerability, we cannot say that this exceptional 60-month sentence " 'shocks the conscience.' " *Ritchie*, 126 Wn.2d at 396 (quoting *Ross*, 71 Wn. App. at 571-72).

¶40 We hold, therefore, that the trial court acted within its discretion when it imposed an exceptional 60-month sentence on Hovig, based on MH's inherent vulnerability.

¶41 Affirmed.

HOUGHTON and ARMSTRONG, JJ., concur.

Review denied at 166 Wn.2d 1020 (2009).