FILED
COURT OF APPEALS
DIVISION II

2013 DEC 17 AM 8: 48

STATE OF WASHINGTON
BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42396-1-II |
| Respondent/Cross Appellant, | (Consolidated w/ No. 43021-5-II) |
| v. | PART PUBLISHED OPINION |
| THOMAS LEE FLOYD, | |
| Appellant/Cross Respondent. | |

BJORGEN, J. — Thomas Floyd appeals from his convictions for second degree assault and six violations of a no-contact order, as well as the sentencing court's use of his 1972 convictions for robbery and second degree assault in calculating his offender score. The State cross appeals the sentencing court's determination that Floyd does not qualify as a persistent offender subject to a mandatory life sentence under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570. The State also appeals from a different sentencing court's offender score calculation, resulting from Floyd's subsequent conviction for stalking and violation of a no-contact order based on conduct involving the same victim.

Floyd, aided by standby counsel, represented himself in a jury trial in the first proceeding after the State charged him with assault and violating a no-contact order under cause number 10-1-00019-6. Shortly after Floyd began his closing argument, the trial court terminated his pro se status and directed standby counsel to complete the argument. The jury found Floyd guilty of all charges. The State had asked that Floyd be sentenced to a life term as a persistent offender based

on the two 1972 convictions, but the sentencing court ultimately refused, finding the robbery[1] conviction unconstitutional on its face and the assault conviction not comparable to a "most serious offense" under RCW 9.94A.030(32). Verbatim Report of Proceedings (VRP) (Dec. 2, 2011) at 106. The sentencing court nonetheless used both prior convictions in calculating Floyd's offender score, sentencing him to the maximum standard-range term of confinement.

The State subsequently charged Floyd under cause number 11-1-02808-1 with stalking and an additional count of violating a no-contact order involving the same victim. Floyd again represented himself, and a jury returned guilty verdicts on both counts. The sentencing court agreed with the prior sentencing court's determinations concerning the 1972 convictions, but independently calculated Floyd's offender score, again sentencing him to the maximum standard-range term.

Floyd argues that (1) the first trial court violated his right to defend in person by terminating his pro se status; (2) insufficient evidence supports his convictions for violating a no-contact order at the first trial; and (3) the first sentencing court erroneously included his 1972 convictions for robbery and assault in his offender score. The State argues that (1) the first sentencing court erred by refusing to count the two 1972 convictions as "strikes" for purposes of the POAA, and (2) the second sentencing court erred by refusing to include the 1972 convictions in calculating Floyd's offender score.

---

[1] In 1972, the robbery statute did not define varying degrees of the crime. Former RCW 9.75.010 (1909), *repealed by* LAWS OF 1975, 1st Ex. Sess. § 260.

2

No. 42396-1-II (Cons. w/ No. 43021-5-II)

In this consolidated appeal, we affirm each of Floyd's challenged convictions, as well as the sentence imposed after Floyd's second trial. We vacate the sentence imposed after the first trial, however, and remand for resentencing in accordance with this opinion.

FACTS

I. FLOYD'S FIRST TRIAL

Floyd and his wife,[2] Annette Bertan, had an altercation on the night of January 3, 2010 at their Lakewood condominium. Their downstairs neighbor called 911 after Bertan came to his door bleeding from a wound near her left ear. Responding officers encountered Floyd in the parking lot, noticed blood on his hands, and arrested him.

On January 4, 2010, the trial court entered an order in open court prohibiting Floyd from contacting Bertan. Over the next few months, Floyd nonetheless attempted to call Bertan several times from the Pierce County jail and Western State Hospital.[3] The State ultimately charged Floyd by amended information with one count of second degree assault involving domestic violence and six counts of violating a no-contact order.

The State filed a notice that it intended to seek a mandatory life sentence under the persistent offender statute, based on Floyd's 1972 convictions for robbery and assault. The trial court allowed Floyd to represent himself, finding Floyd's request explicit, knowing, and voluntary, but appointed standby counsel over Floyd's objection.

---

[2] Bertan obtained a divorce after the events giving rise to the assault charge, but prior to Floyd's trial.

[3] Floyd underwent multiple court-ordered competency and other medical evaluations at Western State Hospital after various pretrial proceedings.

3

At trial, Floyd's limited knowledge of court procedures and rules of evidence, as well as his apparent confusion and frustration when the trial court sustained most of the State's objections, led to many disruptions and repeated admonitions by the court. The trial court also spent considerable time hearing motions brought by Floyd that it ultimately found duplicative or meritless. However, Floyd rarely interrupted the presentation of the State's evidence, addressed the court respectfully, generally accepted the court's rulings on his objections without protest, and appeared to make a genuine effort to follow the court's instructions.

During closing argument, Floyd referred to several facts not in evidence, drawing repeated objections from the State. VRP at 733-34, 736, 738. After the court admonished Floyd again to argue only from evidence properly before the jury, Floyd asked questions which demonstrated some confusion as to what the court meant. VRP at 739. Floyd also attempted to offer additional evidence through his statements during closing. VRP at 743.

At that point the court excused the jury and, after expressing the opinion that Floyd had intentionally acted to "scuttle" the trial, engaged in a colloquy with Floyd and heard argument from the State and Floyd's standby counsel. VRP at 740. Then, over objections from both Floyd and the State, the court terminated Floyd's pro se status and appointed standby counsel to complete closing argument. Standby counsel argued that the jury could convict Floyd only of third degree assault because Bertan did not suffer substantial bodily harm. The jury returned guilty verdicts on all counts.

At sentencing, the court concluded that the State could not rely on either of Floyd's 1972 convictions as "strikes" for purposes of the POAA. VRP (July 15, 2011) at 106. The court ruled the robbery conviction invalid on its face because the information and two of the jury

4

instructions misstated the elements of the crime, and it found the assault conviction not comparable to a "most serious offense" under current law because of differences in the mens rea and degree-of-injury elements. VRP (July 15, 2011) at 106. The court then concluded that both 1972 convictions counted towards Floyd's offender score, making it four. The court ultimately sentenced Floyd to 20 months' confinement on the assault charge and to a 3-year suspended sentence for the remaining counts.

## II. FLOYD'S SECOND TRIAL

The State subsequently charged Floyd with violation of a domestic violence court order and stalking, based on his further attempts to contact Bertan. Floyd again represented himself, aided by the same standby counsel assigned by the previous trial court, and the jury returned guilty verdicts on both charges. The sentencing court sua sponte raised a question as to whether collateral estoppel required it to accept the prior sentencing court's determinations concerning Floyd's criminal history. Ultimately, the court accepted the argument made by Floyd's standby counsel that it should agree with the prior sentencing court's conclusions as to Floyd's 1972 convictions, but not the prior offender score calculation. The court sentenced Floyd to 17 months on each charge, running concurrently with each other but consecutively to the previous sentences.

## ANALYSIS

### I. THE RIGHT TO SELF-REPRESENTATION

Floyd contends that the trial court violated his right to represent himself. Because the court's determination that he intentionally disrupted the proceedings was not manifestly unreasonable and rests on a sufficient factual basis in the record, we disagree.

5

Washington's constitution explicitly guarantees criminal defendants the right to self-representation. *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010) (citing WASH. CONST. art. I, § 22 ("the accused shall have the right to appear and defend in person")). The United States Supreme Court has also held that the Sixth Amendment to the United States Constitution implicitly guarantees this right. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Courts regard this right as "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *Madsen*, 168 Wn.2d at 503 (citing *State v. Vermillion*, 112 Wn. App. 844, 51 P.3d 188 (2002)). Improper denial of the right to proceed pro se requires reversal, whether or not prejudice results. *Vermillion*, 112 Wn. App. at 851.

We review a trial court's denial of the right to defend in person for abuse of discretion. *State v. Hemenway*, 122 Wn. App. 787, 792, 95 P.3d 408 (2004). A trial court abuses its discretion if its "decision is manifestly unreasonable or 'rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Madsen*, 168 Wn.2d at 504 (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

A trial court may terminate pro se status if a defendant "deliberately engages in serious and obstructionist misconduct,"[4] *Faretta*, 422 U.S. at 834-35 n.46; that is, "if a defendant is

---

[4] The case cited by the *Faretta* court in its discussion of conduct that would justify denial of the right to self-representation, *Illinois v. Allen*, involved the defendant's right to be present at trial. 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). In that context, a court may only order a defendant removed from the courtroom who "engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." *Allen*, 397 U.S. at 338. While the record before us does not establish that Floyd's conduct exceeded that limit, we do not take the *Faretta* court's citation to *Allen* to mean that the degree of disruption required to justify revocation of a defendant's pro se status under the United

sufficiently disruptive or if delay becomes the chief motive." *Madsen*, 168 Wn.2d at 509 n.4.

That a defendant is "obnoxious" and "unfamiliar with legal rules," however, does not justify a

trial court's denial of the right to proceed pro se. *Madsen*, 168 Wn.2d at 509. A court may

impose lesser sanctions for failure to adhere to proper procedures, but "must not sacrifice

constitutional rights on the altar of efficiency." *Madsen*, 168 Wn.2d at 509.

Here, the trial court explicitly based its decision on its finding that Floyd was

intentionally disrupting the trial:

> THE COURT: Well, I am considering—I gave Mr. Floyd the floor 17 minutes ago at 2:22. He has taken 17 minutes now in closing argument, and I would say all but one minute of it has been an effort to argue facts not in evidence, or to make inappropriate statements that are, I think, disruptive. It's become pretty clear to me that he is undertaking to, as I said, scuttle this trial.
> MR. FLOYD: No, sir.
> THE COURT: He is disruptive. And what is most important is he has consistently showed an inability to follow or respect the Court's directions. The Court has directed him to argue the facts in evidence. He has gone beyond the facts. He is arguing what—holding up investigative reports. He wants to testify anew as to what the pictures show, which he can't do. And I think he is intentionally doing that to disrupt this proceeding.

VRP at 743. These remarks show that the trial court applied the correct legal standard, as

articulated by our Supreme Court in *Madsen*.

The next inquiry under *Madsen* is whether the trial court's action rested on a sufficient

factual basis in the record. Because the trial court has the opportunity to observe a defendant's

demeanor and nonverbal conduct, appellate courts owe considerable deference to a trial court's

finding in this regard. *See State v. Read*, 163 Wn. App. 853, 864, 261 P.3d 207 (2011) (noting

that even an "independent constitutionally based review requires us to give due regard 'to the

---

States Constitution is as extreme as that required to justify removing a defendant from the
courtroom.

trial judge's opportunity to observe the demeanor of the witnesses' and the trial court's determination as to credibility.") (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-500, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)).

As described above, the record shows repeated disruptions by Floyd and repeated admonitions by the court, as well as considerable time spent by the court hearing motions brought by Floyd that the court ultimately found duplicative or meritless. The record shows that much of Floyd's closing argument was devoted to attempting to argue facts not in evidence, including testifying anew as to what pictures in an investigative report showed.

On the other hand, the force of these complications is diluted by the timing of the court's action: the trial had proceeded nearly to its conclusion, thus reducing the time that would be wasted by further problems. Nonetheless, the record is clear that the obstacles from Floyd's actions were continuing unabated into closing argument. Taken as a whole, the record contains sufficient evidence to support the trial court's finding that Floyd intentionally disrupted the proceedings. Under the circumstances presented, we are unwilling to second-guess the trial court's determination.

Finally, whether the trial court's decision was manifestly unreasonable presents a closer question for two reasons. First, during the discussion leading up to the court's termination of his pro se status, Floyd asked for one more chance and promised to consult closely with standby counsel to avoid further disruption. The court, however, did not give Floyd the opportunity to follow through on this promise. We are troubled that the trial court did not attempt this measure as a last resort, since it is the sort of less severe course of action discussed in *Madsen*, 168 Wn.2d at 509 n.4. However, the numerous delays and disruptions continuing well into closing argument

supply a plausible basis for terminating pro se status without trying this last alternative. Although it would have been better practice to attempt this measure, declining the invitation was not manifestly unreasonable.

Second, prior to the revocation of Floyd's pro se status, standby counsel informed the court that he would make the closing argument he deemed best supported by the law and the facts, even though Floyd desired to make a different argument.[5] In establishing the right to represent oneself, *Faretta*, 422 U.S. at 819-21, made clear that the right to control one's defense, although subject to limitations, supports the implication of the right to represent oneself from the Sixth Amendment.[6] If the control of one's defense plays a role in the recognition of the right to pro se representation, it should also play a role in determining whether revocation of that right is an abuse of discretion. Therefore, the court's knowledge that revocation of pro se status would force an unwanted defense on Floyd must be considered in deciding whether that revocation was an abuse of discretion.

Under *Faretta* and *Coristine*, forcing an unwanted defense on a criminal defendant may in many cases slip into a violation of the Sixth Amendment. *Faretta*, 422 U.S. 819-21; *State v. Coristine*, 177 Wn.2d 370, 376-77, 300 P.3d 400 (2013). Here, however, the trial court revoked pro se status only after unabated missteps sufficient to support the finding that the defendant was

---

[5] Floyd sought to defend by asserting that the victim had harmed herself. When his pro se status was terminated, his counsel argued that he was at most guilty only of third degree assault, because the victim did not suffer substantial bodily harm.

[6] Although not involving pro se representation, the recent decision in *State v. Coristine*, 177 Wn.2d 370, 300 P.3d 400 (2013), is in harmony with *Faretta*, holding that the Sixth Amendment requires the court to honor a defendant's voluntary and intelligent choice to forgo an affirmative defense and that instructing the jury on an affirmative defense over the defendant's objection is unconstitutional. *Coristine*, however, does not analyze whether the revocation of pro se status is flawed if it leads to the presentation of an unwanted defense.

No. 42396-1-II (Cons. w/ No. 43021-5-II)

intentionally disrupting the proceedings. In that posture, revocation does not become manifestly unreasonable because it results in an unwanted defense that, in counsel's opinion, will better serve the defendant's case. *See State v. Bergstrom*, 162 Wn.2d 87, 95, 169 P.3d 816 (2007).

The trial court did not abuse its discretion in terminating Floyd's pro se status based on the determination that he intentionally disrupted the proceedings. We therefore affirm his convictions.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## II. THE TRIAL COURT'S PERSISTENT OFFENDER DETERMINATION

The State argues that the first trial court erred in refusing to sentence Floyd to a life term as a persistent offender. The State challenges the trial court's conclusions that Floyd's 1972 assault conviction is not comparable to a most serious offense under RCW 9.94A.030(32)(u), and that his 1972 robbery conviction does not count as a "strike" under the statute because the conviction is invalid on its face. We review de novo a trial court's application of relevant statutes in making sentencing determinations under the persistent offender statute. *State v. Carpenter*, 117 Wn. App. 673, 679, 72 P.3d 784 (2003) (citing *In re Post-Sentencing Review of Charles*, 135 Wn.2d 239, 245, 955 P.2d 798 (1998)). Under that standard, we hold that the 1972 assault conviction was not comparable to a most serious offense under RCW 9.94A.030(32)(u) and that the 1972 robbery conviction was facially invalid. Consequently, the trial court did not err in refusing to sentence Floyd as a persistent offender.

10

A.      Comparability of Floyd's 1972 Assault Conviction to a Most Serious Offense

A Washington conviction that predates the POAA counts as a strike only if it is "comparable" to a "most serious offense" listed elsewhere in RCW 9.94A.030(32). RCW 9.94A.030(32)(u); *State v. Failey*, 165 Wn.2d 673, 677, 201 P.3d 328 (2009) (applying comparability analysis to 1974 Washington robbery conviction). The statute includes second degree assault as a "most serious offense," but not lesser degrees of assault. RCW 9.94A.030(32)(b).

To determine which current offense most closely compares to a prior conviction, courts must first look to the specific elements of the crimes. *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998). If the elements differ, we must then examine the information to determine whether those allegations in the information "directly related to the elements of the charged crime" would suffice under current Washington law to convict a defendant of the most serious offense at issue. *Morley*, 134 Wn.2d at 605-06 (involving comparability of an out-of-state conviction). The State bears the burden of establishing the comparability of a prior conviction. *State v. Thomas*, 135 Wn. App. 474, 487, 144 P.3d 1178 (2006).

We begin with the elements of the crime at issue, second degree assault. The 1972 statute under which Floyd was convicted required the State to prove that Floyd "willfully inflict[ed] grievous bodily harm" on the victim. Former RCW 9.11.020(3) (1909) (LAWS OF 1909, ch. 249, § 162, *formerly codified at* REM. & BAL. CODE § 2414). To convict under the current statute defining second degree assault, the State must prove the defendant "[i]ntentionally assault[ed] another and thereby recklessly inflict[ed] substantial bodily harm." RCW

11

9A.36.021(1)(a). Thus, the elements differ as to both the mens rea and the degree of harm required.

We have held that "wil[l]fully" equates to "knowingly," a "less serious form of mental culpability than 'intent.'" *City of Spokane v. White*, 102 Wn. App. 955, 961, 10 P.3d 1095 (2000) (citing *State v. Thomas*, 98 Wn. App. 422, 424-25, 989 P.2d 612 (1999)). Thus it appears that the trial court could have convicted Floyd in 1972 based on a lesser degree of culpability than required by the current second degree assault statute.

More importantly, the difference in the degree of harm required by the two statutes shows that they are not comparable under the POAA. In 1972 the "grievous bodily harm" element in former RCW 9.11.020 was defined as "hurt or injury calculated to interfere with the health or comfort of the person injured" or "atrocious, aggravating, harmful, painful, hard to bear, [and] serious in nature." *State v. Salinas*, 87 Wn.2d 112, 121, 549 P.2d 712 (1976) (internal quotations omitted) (citing *State v. Linton*, 36 Wn.2d 67, 95-96, 216 P.2d 761 (1950)). Current law defines "substantial bodily harm" as

> bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part.

RCW 9A.04.110(4)(b). Thus, a painful injury that interfered with the comfort of the victim, but did not cause disfigurement or fracture or impair the function of any bodily part, would suffice to establish grievous bodily harm under the 1972 statute, but not substantial bodily harm under the present statute. The 1972 court could therefore have also convicted Floyd based on a lesser degree of injury.

12

The State argues that case law establishes that both the degree-of-harm (grievous bodily harm) and mens rea (willfullness) elements of the 1972 assault statute are comparable to the current second degree assault statute, citing *State v. Hovig*, 149 Wn. App. 1, 202 P.3d 318 (2009), and *State v. Stewart*, 73 Wn.2d 701, 440 P.2d 815 (1968), respectively.

*Hovig* involved a challenge to the sufficiency of the evidence under the "substantial bodily harm" standard. *Hovig*, 149 Wn. App. at 10-11. Hovig argued that because the injury to the victim was less serious than the injury in an earlier case, *State v. Miles*, 77 Wn.2d 593, 464 P.2d 723 (1970), in which a conviction obtained under the "grievous bodily harm" standard was overturned on a sufficiency challenge, the evidence against Hovig must also be insufficient as a matter of law because the "substantial bodily harm" standard was higher. *Hovig*, 149 Wn. App. at 11-12. We rejected that argument not because we decided that "substantial bodily harm" was the same as or less than "grievous bodily harm," but because the injury in *Miles* could have satisfied the grievous bodily harm standard had the State presented more testimony:

> *Miles* did not hold that a cut and swollen lip could never constitute "grievous" bodily harm. Instead, the Supreme Court reversed Miles's conviction for second degree assault because the State had failed to produce sufficient evidence to show that the injury was "grievous." The *Miles* court reached that conclusion because (1) "[n]one of the witnesses was called upon to elaborate upon the nature, size, extent, or degree of the cut or the swollen lip"; and (2) "[t]here was no testimony whatsoever as to any other bruises or contusions."

*Hovig*, 149 Wn. App. at 12 (quoting *Miles*, 77 Wn.2d at 600-01) (citations omitted).[7] Thus, to

---

[7] Ultimately, the *Hovig* court relied on a different authority, *State v. Ashcraft*, 71 Wn. App. 444, 455-56, 859 P.2d 60 (1993), to hold that the bruising injury at issue satisfied the "substantial bodily harm" standard based on the "substantial disfigurement" prong. *Hovig*, 149 Wn. App. at 12.

No. 42396-1-II (Cons. w/ No. 43021-5-II)

the extent that *Hovig* is relevant to the comparability analysis at all, it does not support the State's position here.

In the other case cited by the State, *Stewart*, 73 Wn.2d 701, the defendant assigned error to the trial court's refusal to give an instruction that the jury must find "specific intent" to convict for assault. Our Supreme Court rejected the challenge, holding that the term "willfully," appearing in instructions given to the jury, properly explained the mental element of the crime, was not ambiguous, and did not require additional definition, citing cases holding that "willfully" meant "'intentionally and designedly.'" *Stewart*, 73 Wn.2d at 704 (quoting *State v. Spino*, 61 Wn.2d 246, 377 P.2d 868 (1963)

Current law, however, provides that an action is taken "willfully" if the State proves the defendant acted "knowingly," a lesser form of culpability than intent. RCW 9A.08.010(4); *White*, 102 Wn. App. at 961. Thus, it is far from clear that the *Stewart* court's "intentionally and designedly" language equates with the degree of culpability now codified as "intentionally." *See also State v. Bauer*, 92 Wn.2d 162, 167-68, 595 P.2d 544 (1979) (noting that "[t]he term 'willful' has been given many meanings" and "is often used to denote an act which is voluntary or knowing").

Regardless, the "willfulness" issue does not affect our analysis regarding the degree-of-harm requirement, which itself confirms the trial court's ruling that the conviction was not comparable to second degree assault under post-POAA law. At most, the 1972 assault conviction is comparable to a lesser degree of assault, and thus does not qualify as a most serious offense. RCW 9.94A.030(32). The State's argument fails.

14

Because the elements of the crime underlying Floyd's 1972 assault conviction differ from those of the most closely related most serious offense under RCW 9.94A.030(32)(u), we proceed to the second step of the comparability analysis. *Morley*, 134 Wn.2d at 606. At this step, we examine the 1972 information to determine whether those allegations in the charging document "directly related to the elements of" second degree assault would constitute a violation of the post-POAA second degree assault statute. *Morley*, 134 Wn.2d at 606.

The second amended information on which Floyd's 1972 assault conviction rests merely parroted the language from the statute, alleging that Floyd "did willfully inflict grievous bodily harm upon the" victim, under circumstances not amounting to first degree assault. Ex. 3. Thus, the allegations in the information also fail to establish that the conviction is comparable to second degree assault under current law. Therefore, the differences in the elements support the conclusion reached by both sentencing courts that the State failed to prove the 1972 assault conviction was comparable to a "most serious offense" under RCW 9.94A.030(32)(u).

B.      Facial Invalidity of Floyd's 1972 Robbery Conviction[8]

The State argues that the sentencing court improperly looked "behind the face" of Floyd's 1972 robbery conviction in assessing its validity. Br. of Resp't at 24. Because documents properly considered by the sentencing court establish the conviction's invalidity, the State's argument fails.

---

[8] The State asserts that "[t]he trial court erred in allowing [Floyd] to collaterally attack his 1972 conviction for robbery" in the sentencing proceeding. Br. of Resp't at 21. However, a challenge to the use of a prior conviction in a sentencing proceeding is not a collateral attack, as our courts have long recognized. *See State v. Knippling*, 166 Wn.2d 93, 102-04, 206 P.3d 332 (2009); *State v. Holsworth*, 93 Wn.2d 148, 158, 607 P.2d 845 (1980). The argument the State actually presents involves whether the sentencing court went "behind the face" of the conviction, and we address it as such. Br. of Resp't at 24.

15

In a sentencing proceeding, the defendant's ability to challenge the validity of a prior conviction is "severely restricted." *State v. Bembry*, 46 Wn. App. 288, 289, 730 P.2d 115 (1986). A sentencing court may not rely, however, on a conviction "constitutionally invalid on its face" to increase the punishment. *State v. Ammons*, 105 Wn.2d 175, 187-88, 718 P.2d 796 (1986).

In both *Ammons*, 105 Wn.2d at 189, and *Bembry*, 46 Wn. App. at 291, the "face" of the conviction included the documents signed as part of a guilty plea, which incorporate the charging document. *See* CrR 4.2(g). Our Supreme Court, furthermore, relied on the interpretation of "invalid on its face" appearing in *Ammons*, 105 Wn.2d at 187-89, a case involving whether prior convictions counted towards a defendant's offender score at sentencing, to interpret similar language in RCW 10.73.090, which bars most personal restraint petitions filed more than one year after a judgment becomes final. *In re Pers. Restraint of Stoudmire*, 141 Wn.2d 342, 353, 5 P.3d 1240 (2000).

Similarly, in interpreting the meaning of "constitutionally valid on its face" for purposes of deciding what documents a court may consider when a defendant challenges the inclusion of a prior conviction at sentencing, we relied on a case involving the RCW 10.73.090 time bar. *State v. Gimarelli*, 105 Wn. App. 370, 375, 20 P.3d 430 (2001) (citing *In re Pers. Restraint of Thompson*, 141 Wn.2d 712, 718, 10 P.3d 380 (2000)). Thus, the phrase "on its face" clearly has a similar meaning in both lines of cases.

In the context of whether a "judgment and sentence is invalid on its face" for purposes of overcoming the one-year time limit on personal restraint petitions, arguably the more restrictive

16

of the two lines of cases,[9] our courts have relied on "charging documents, verdicts, and plea statements of defendants on plea of guilty." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 140-43, 267 P.3d 324 (2011). The *Stoudmire* court, for example, held the judgment and sentence at issue there facially invalid because the date on the information showed that the charges had been filed after the time specified by the statute of limitations. 141 Wn.2d at 354-55. Our courts have generally not, however, based invalidity decisions on "jury instructions, trial motions, and other documents that relate to whether the defendant received a fair trial." *Coats*, 173 Wn.2d at 140.

Here, the sentencing court looked to the charging document and the jury instructions. The charging document plainly qualifies as part of the "face" of the conviction under the precedents discussed above. Thus the sentencing court did not err in considering it.

A criminal defendant has a constitutional right "to be informed of the criminal charge against him so he will be able to prepare and mount a defense at trial." *State v. McCarty*, 140 Wn.2d 420, 425, 998 P.2d 296 (2000). Thus, a charging document that fails to clearly set forth "[e]very material element of the charge" renders the resulting conviction constitutionally invalid. *McCarty*, 140 Wn.2d at 425. In this review, an information "not challenged until after the verdict will be more liberally construed in favor of validity than" one challenged before the verdict. *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). Nonetheless, "[i]f the necessary elements are not found or fairly implied" in the charging document, we must reverse "without reaching the question of prejudice." *McCarty*, 140 Wn.2d at 425-26.

The 1972 information charging Floyd with robbery alleges that he took "personal property from the person or in the presence of [the alleged victim], the owner thereof, against his

---

[9] See our discussion in *Gimarelli*, 105 Wn. App. at 377.

17

No. 42396-1-II (Cons. w/ No. 43021-5-II)

will *or* by means of force or violence or fear of immediate injury to his person." Clerk's Papers at 272 (emphasis added). The statute in effect in 1972 defined "robbery" as

> the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property, or the person or property of a member of his family, or of anyone in his company at the time of the robbery.

Former RCW 9.75.010 (1909) (LAWS OF 1909, ch. 240, § 166, *formerly codified at* REM. & BAL. CODE § 2418). This plainly required that the taking be both against the will of the victim *and* by force or threat of violence.

By stating two necessary elements in the disjunctive, the information allowed a conviction based on only one of those elements. Thus, the 1972 court could have convicted Floyd merely for taking property against the will of the victim, even if it did not find that Floyd had used force or threats. This effectively omitted a material element of the charge, which cannot be "fairly implied," and therefore evidences constitutional invalidity without the need to show prejudice. *See McCarty*, 140 Wn.2d at 425-26.

The court's additional consideration of the jury instructions, which repeated the error found in the information, does not affect our analysis. Even if the court should not have considered the jury instructions, it properly considered the charging document in determining facial invalidity. As shown, the charging document alone establishes the constitutional infirmity of Floyd's 1972 robbery conviction. Therefore, the sentencing court properly declined to count that conviction as a strike under the POAA because it is facially invalid.

18

### III. THE SENTENCING COURTS' OFFENDER SCORE CALCULATIONS

Floyd argues that the first sentencing court erred in using his 1972 convictions to calculate his offender score. Because a court may not use facially invalid convictions for any sentencing purpose, and the 1972 assault conviction washed out, Floyd is correct.

We review offender score calculations de novo. *State v. Powell*, 172 Wn. App. 455, 459, 290 P.3d 353 (2012) (citing *State v. Knippling*, 166 Wn.2d 93, 98, 206 P.3d 332 (2009)). A sentencing court may not rely on a conviction invalid on its face to increase the penalty for an offense. *Morley*, 134 Wn.2d at 614 (citing *Ammons*, 105 Wn.2d at 187-88).

As shown above, Floyd's 1972 robbery conviction is constitutionally invalid on its face. Thus the first sentencing court erred in using it to calculate Floyd's offender score.

For sentencing purposes, a conviction for a class C felony washes out of an offender's criminal history if the offender spends five years in the community without any criminal convictions. RCW 9.94A.525(2)(c). As discussed above, Floyd's 1972 assault conviction is not comparable to second degree assault, a class B felony. Thus, for sentencing purposes it may be considered at most a class C felony. *See Thomas*, 135 Wn. App. at 487.

The criminal history submitted by the State at Floyd's sentencing shows that Floyd had no criminal convictions between his conviction for third degree driving with a suspended license on November 3, 2001, and July 29, 2007, a period of approximately five years and seven months. Thus, the 1972 assault conviction washed out pursuant to RCW 9.94A.525(2)(c), and the first sentencing court should not have considered it.

The State contends that the first sentencing court properly considered the 1972 convictions, and that the second sentencing court erred in refusing to consider them based on the

first court's comparability and facial invalidity analyses. [10] The State asserts that in doing so the second sentencing court improperly relied on principles of collateral estoppel.

The record shows, however, that the second sentencing court accepted the arguments of Floyd's standby counsel as to the offender score calculation: standby counsel alone argued for an offender score of two, the score ultimately determined by the court. Floyd's standby counsel explicitly argued against using collateral estoppel, instead relying on the same arguments he had made in Floyd's first sentencing proceeding.

For the reasons discussed above, these arguments are correct. Thus, the second sentencing court independently and properly calculated the offender score, as the statute requires. RCW 9.94A.345. As concluded, the first sentencing court improperly included the 1972 convictions in the offender score calculation. Because Floyd made a specific and timely

---

[10] The State also contends that the second sentencing court erred by refusing to include "a 1981 conviction for taking a vehicle without permission" in calculating Floyd's offender score. Br. of Resp't (No. 43021-5-II) at 6. The record shows that the State furnished both sentencing courts with a copy of a California judgment and sentence from 1981, reflecting that Floyd was convicted of "receiving stolen property," namely, "a 1979 moped" valued at more than $200. Ex. 1 (Cause No. 11-1-02808-1). However, the State presented no argument to either sentencing court, and presents none here, establishing that this conviction is comparable to any class A or B felony under Washington law. Notably, the State's claim assumes the questionable proposition that a moped qualifies as a "motor vehicle" for purposes of crimes against property. *See United States v. Dotson*, 34 F.3d 882, 886 (9th Cir. 1994) (holding that a moped is not a motor vehicle for purposes of Washington's driving under the influence statute).

The State has the burden of establishing the comparability of foreign convictions at a sentencing proceeding. *Thomas*, 135 Wn. App. at 487. A cursory inspection of the elements and related allegations in the information suggests that the conviction is at most comparable to a class C felony: second degree taking a motor vehicle without permission under RCW 9A.56.075 or second degree theft under RCW 9A.56.040. Thus, were we to find the issue properly before us, this conviction would also apparently have washed out under RCW 9.94A.525(2)(c), because Floyd later spent five crime-free years in the community. At any rate, we generally do not consider issues not supported by argument or authority in a party's brief. RAP 10.3(a)(5); *State v. Blunt*, 118 Wn. App. 1, 7 n.6, 8, 71 P.3d 657 (2003). Furthermore, we generally do not address claims of error not properly raised in the trial court. RAP 2.5(a). We thus decline to address the merits of the claim.

20

objection in the first sentencing proceeding to the use of the 1972 convictions, the appropriate

remedy is to "'remand for resentencing without allowing further evidence to be adduced'" by the

State. *State v. Lopez*, 147 Wn.2d 515, 520-22, 55 P.3d 609 (2002) (quoting *State v. Ford*, 137

Wn.2d 472, 485, 973 P.2d 452 (1999)).[11]

IV. SUFFICIENT EVIDENCE THAT FLOYD KNOWINGLY VIOLATED THE NO-CONTACT ORDER

With respect to the six convictions for violating a no-contact order resulting from his first

trial, Floyd argues that the State failed to present sufficient evidence that he "knowingly"

violated the order because no testimony established that Floyd knew that the court had entered it.

Br. of Appellant at 14-16. Because a rational juror could have inferred from the signature on the

order, above the line marked "Defendant," that Floyd was present when the court entered it, this

claim fails.

In evaluating the sufficiency of the evidence at a jury trial, we consider the evidence, and

the reasonable inferences from them, in the light most favorable to the State. *Salinas*, 119 Wn.2d

---

[11] We note that last sentence of RCW 9.94A.530(2), added in 2008, appears to permit the State to supplement the record with materials not previously considered by the court at a sentencing proceeding following remand, notwithstanding a specific objection raised by the defendant at the previous sentencing hearing. The legislature plainly intended the 2008 amendment to overturn our Supreme Court's holdings in *Ford* and *Lopez* prohibiting presentation of such additional evidence. LAWS OF 2008, ch. 231, § 1 (identifying by name those decisions, among others, as the reason for the amendments). The holdings in *Ford* and *Lopez*, however, appear to rest on constitutional due process concerns. *See State v. Hunley*, 175 Wn.2d 901, 912-15, 287 P.3d 584 (2012) (noting that "the *Ford* decision was rooted in principles of due process"); *Ford*, 137 Wn.2d at 482 (relying on "basic principles of due process" in its analysis); *Lopez*, 147 Wn.2d at 522 (rejecting as "'inconsistent with the principles underlying our system of justice'" the argument that the State, despite the defendant's reasonably specific and timely objection, could present additional evidence of prior convictions following remand) (quoting *Ford*, 137 Wn.2d at 480) (internal quotation marks omitted). "The legislature may change a statutory interpretation, but it cannot modify or impair a judicial interpretation of the constitution." *Hunley*, 175 Wn.2d at 914. Thus, until our Supreme Court expressly accepts the 2008 amendment to RCW 9.94A.530(2) as consistent with due process, we continue to follow the no-second-chance rule articulated in *Ford* and *Lopez*.

at 201. We then ask whether a rational juror could have found the defendant guilty beyond a reasonable doubt. *Salinas*, 119 Wn.2d at 201. We consider circumstantial and direct evidence equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

The fact finder may infer, but not presume, knowledge. *State v. Womble*, 93 Wn. App. 599, 604, 969 P.2d 1097 (1999). The jury may "pyramid[]" reasonable inferences derived from the proven evidence so long as the court instructs it that it must find that the State has proven beyond a reasonable doubt the element of the crime that those inferences support. *State v. Bencivenga*, 137 Wn.2d 703, 708-11, 974 P.2d 832 (1999).

Here, the trial court admitted a certified copy of the no-contact order as evidence, and the document prominently states, "FILED IN OPEN COURT." Ex. 70. The signature line on the order marked "Defendant" bears a handwritten signature. Ex. 70. The court properly instructed the jury on the burden of proof. A rational juror could therefore have properly inferred that Floyd signed the document in open court, and from that inferred that Floyd knew of the order. For these reasons, Floyd's claim fails.

## V. FLOYD'S STATEMENT OF ADDITIONAL GROUNDS

Floyd raises a number of issues in his one-page pro se statement of additional grounds (SAG), including spoliation of evidence, prosecutorial misconduct, double jeopardy, ineffective assistance of counsel, violation of judicial canons, and violation of his right to a speedy trial. While a pro se SAG need not include citations to the record or legal argument, the appellant must "inform the court of the nature and occurrence of the alleged errors." RAP 10.10(c). Floyd's vague, conclusory assertions do not allow for proper review of most of these claims, and we

therefore do not reach them. Only the speedy trial and spoliation claims merit consideration under these standards. On the record before us, however, these claims also fail.

Whether Floyd's bare assertion of a speedy trial violation satisfies the requirements of RAP 10.10 presents a doubtful proposition. Even a cursory evaluation of the record before us, however, suggests that Floyd may have a colorable claim in this regard: Floyd spent over a year in custody before commencement of his first trial and asserted his right to a speedy trial on several occasions. *See State v. Ollivier*, No. 86633-3, slip op. at 10, 312 P.3d 1 (Wash. Oct. 31, 2013). Furthermore, the trial court granted a number of continuances over Floyd's objections.

Proper analysis of the claim, however, requires consideration of the reasons for each delay. *Ollivier*, No. 86633-3, slip op. at 14-15 (citing *State v. Iniguez*, 167 Wn.2d 273, 294, 217 P.3d 768 (2009) (citing *Barker v. Wingo*, 407 U.S. 514, 531, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972))). The record does not reveal exactly how many continuances the court below granted or the reasons it granted each one. The party seeking review is responsible for transcription of those portions of the proceedings necessary to evaluate the claim. RAP 9.2. We therefore decline to reach the issue on the record before us. *See Stuart v. Consol. Foods Corp.*, 6 Wn. App. 841, 846-47, 496 P.2d 527 (1972) ("In order to evaluate a trial court's decision, the basis for the decision must be known.").

As for the spoliation claim, Floyd alleges that the "victim, detectives, & State of Washington Correction officers" destroyed "D[igital ]V[ideo ]D[isc]'s, C[omputer ]D[isc]'s, Cassettes, mug shot, pajamas etc." SAG at 1. The record before us shows that, with one exception, the State provided every item Floyd requested, other than those the trial court properly found to have no possible relevance to the case. The one exception involves the recorded police

interview with Bertan, the alleged victim. The DVD copy provided by the State had no audio track, and therefore no practical value to the defense. While the relevance of the recording cannot be disputed, Floyd made no showing that the contents would have helped his defense. Further, because Bertan testified at trial, the recording could at most have had some impeachment value.

Absent an affirmative showing that the evidence had exculpatory value, the State's failure to preserve "'potentially useful'" evidence does not violate a criminal defendant's right to due process of law unless the police acted in bad faith. *State v. Straka*, 116 Wn.2d 859, 884, 810 P.2d 888 (1991) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). The State did produce the requested recording, explaining that it had no audio track because the recording equipment at the police station may have malfunctioned. While unfortunate, the explanation is plausible, and Floyd points to nothing suggesting any subterfuge. Because Floyd shows neither that the contents of the recording were exculpatory nor that the State acted in bad faith, his claim fails.

CONCLUSION

We affirm Floyd's convictions for second degree assault and violations of a no-contact order following his first trial, under cause number 10-1-00019-6. We vacate the resulting sentence, however, and remand for resentencing using an offender score calculated without consideration of Floyd's 1972 assault and robbery convictions. We also affirm the sentence

No. 42396-1-II (Cons. w/ No. 43021-5-II)

imposed after his subsequent trial on charges of stalking and violation of a no-contact order under cause number 11-1-02808-1.

BJORGEN, J.

We concur:

HUNT, P.J.

LENGYAR, J.