**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>SEAN ROBERT WAGNER,<br><br>Appellant. | No. 86044-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Sean Wagner appeals his conviction for a hate crime offense, arguing there was insufficient evidence to support his conviction, the trial court erred when it denied his motion to suppress statements made before he was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the court erroneously admitted evidence of his tattoos. We conclude there was sufficient evidence to support Wagner's conviction. We further conclude that any error in admitting Wagner's statements to the police was harmless, and the trial court did not abuse its discretion in admitting evidence of Wagner's tattoos. We affirm Wagner's conviction.

I

On April 14, 2021, Tabatha Shoemake, a former senior animal control officer, was dispatched to a motel to conduct an animal welfare check regarding dogs left in a vehicle. Shoemake removed the dogs from the vehicle, left a note for the owner, and brought the dogs to a local animal shelter. After checking the

dogs into the shelter, she received information from dispatch that the owner of the dogs, later identified as Wagner, had called. Shoemake testified that when she called Wagner back, he was "pretty angry" and was "yelling a lot and cursing." Shoemake gave Wagner the shelter's address and told him he could pick up the dogs the next morning.

The manager of the shelter, Kerri Tenniswood, notified Shoemake that Wagner had arrived and was "very angry." Shoemake called for a second unit to assist and went outside to speak with Wagner. Shoemake testified that when Wagner first saw her, he "stopped and looked at me and clenched his fists and squinted and—and it was when you look at somebody and you know that—just the hatred." Shoemake again told Wagner he needed to wait until the next day to retrieve his dogs. Shoemake testified Wagner walked by her, leaned in about 6 to 12 inches away from her face, and called her a universally known offensive racial epithet.

Shoemake testified that she asked Tenniswood "to kind of keep everybody inside, because I didn't know what he was going to do. And the fact that it became more of a—a racial thing and was more focused on that than the dogs, I kind of just wanted to keep everybody inside." Shoemake observed Wagner "screaming a lot," and running towards and cursing at a White woman who was driving out of the parking lot. Shoemake testified that after Wagner chased the car, he turned around and "just focus[ed] on [her] at that point." Wagner began approaching her "[v]ery aggressively," "red-faced," and screamed other racial epithets. Shoemake testified Wagner threatened to "kick [her] ass," which she took seriously. Wagner

continued to approach Shoemake yelling racial epithets, made racial comments comparing Black children to excrement, and told Shoemake to "go back to Africa where [she] belong[s]."

Shoemake stopped walking, and Wagner got closer to her, prompting Shoemake to tell Wagner to step back. Shoemake testified that when Wagner did not move, she thought he was going to assault her. Wagner held his phone a few inches away from Shoemake's face and showed her a photo of men with rifles and a flag with a swastika on it. Shoemake testified that Wagner stated, " 'We're going to fix this,' " and " 'See this? We're going to fix this. We're going to make this— we're going to make this right.' " Shoemake interpreted this statement as "getting rid of all [B]lack people . . . whether it's sending us back to Africa or something else." During this interaction, Shoemake "key[ed] up her mic[rophone]" on her radio so "the people that are listening to the radio and dispatch [could] hear what's being said." An Edmonds police officer, testified that he heard the call and stated, "I heard anxiety in [Shoemake's] voice that I've never heard before and with repeated radio transmissions, that was elevating and ratcheting up quickly with fear. Again, fear that I've never heard in her voice before."

Tenniswood, a White woman, testified that while Wagner was "hostile and angry," he did not insult or threaten her, and she did not fear he would attack her. Tenniswood stated that Wagner's "whole focus was on [Shoemake]. His— everything he was screaming, the racial slurs, the insults, that was all towards

3

[Shoemake]."  Tenniswood described how what she observed was different than her own interactions with Wagner,

> The difference is that he was—he was very aggressive with her.  He was in very close contact.  With me on the front doorstep, he was walking away; with her, he was—he was leaning in and getting into her space, and he was raging.  Yeah, he—big difference.  I—when I saw him, like, on the roof, it was more like a temper tantrum, and—but this was more, like, rage.

Tenniswood testified that Wagner "treated [Shoemake] like she wasn't human.  He was—you know, at that point, it wasn't—this wasn't about his dogs anymore.  He was—with the racial slurs and the insults, he was treating her like she wasn't human."

An arriving deputy placed Wagner in handcuffs and physically sat Wagner on the bumper of his patrol car, citing concern for officer safety.  Edmonds Police Officer Dan Ceban testified he was asked to watch over Wagner while the deputies conducted their investigation.  Officer Ceban testified that he asked about a black ink mark he saw on Wagner's chest.  Wagner asked Officer Ceban to unzip his jacket, and Officer Ceban testified that he saw "an eagle and a swastika that [he] recognized as symbols for the Nazi party."  Officer Ceban testified that Wagner said,

> "That's right, the Nationalist Party."  He then continued to make multiple statements about he knows that I'm following orders, but he's also following orders, and he's just waiting for the right moment, and when they do come, they will win, and there's nothing we can do about it.  He then continued to say that he hopes that I'm ready to die for my beliefs and my kids, because he is, and that the Nationalist Party will inevitably regain control, and there's nothing we can do about it.

Wagner was arrested and booked into the jail. A booking officer observed and photographed the swastika tattoo and several others. The State charged Wagner with a hate crime offense. In a pretrial motion, Wagner moved to exclude testimony regarding his tattoos.[1] The trial court denied Wagner's motion and stated it was probative as potential evidence of victim selection. During trial, the State introduced testimony from Christopher Magyarics, a research fellow with the Anti-Defamation League Center of Extremism, who testified about the symbolism of Wagner's tattoos. Magyarics testified that Wagner's tattoos included an eagle and swastika tattoo, a "Totenkampf" symbol, a "Vegvísír," and a "Valknot," and the German words "Ruhm" and "Ehre." Magyarics testified these symbols have been appropriated by white supremacists and explained that while Naziism mainly consisted of anti-Semitism, the ideology was also hostile towards individuals who were non-Caucasian.

In addition to the tattoos and Magyarics's testimony, the State introduced as an exhibit a letter Wagner wrote to the Snohomish County District Court in which he stated, "I outlined that I believe Africa is for Africans and they should all be shipped back. That is a realistic political perspective founded on ideas of

---

[1] Wagner received a "provisional" ruling admitting the tattoo evidence from a different judge. The State argues that because Wagner assigned error to this provisional ruling, as opposed to the later ruling before the judge who oversaw trial, we should decline review. Wagner did not assign error to the subsequent evidentiary ruling as required by RAP 10.3(g). However, under RAP 1.2(a), a " 'technical violation of the rules will not ordinarily bar appellate review, where justice is to be served by such review.' " State v. Williams, 96 Wn.2d 215, 220, 634 P.2d 868 (1981) (quoting Daughtry v. Jet Aeration Co., 91 Wn.2d 704, 710, 592 P.2d 631 (1979)). Wagner re-raised the issue to the trial court, and his argument on appeal challenges the trial court's ruling. Justice would not be served by deciding this based on technical compliance or noncompliance with the rule.

nationalism and is protected by the constitution." A jury convicted Wagner of a hate crime offense. Wagner appeals.

II

Wagner argues the State presented insufficient evidence he threatened Shoemake because of her race. We disagree.

Due process requires the State to prove beyond a reasonable doubt every element of a crime. State v. Rodriquez, 187 Wn. App. 922, 930, 352 P.3d 200 (2015). In reviewing a claim for insufficient evidence, this court considers " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis added) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), overruled on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Wagner cites State v. Read, 163 Wn. App. 853, 863-64, 261 P.3d 207 (2011), which provides an additional analytical framework for hate crime offenses. Read states that because a hate crime offense implicates First Amendment rights, we must "conduct 'an independent examination of the whole record' to assure the conviction 'does not constitute a forbidden intrusion into the field of free expression.' " Id. (quoting State v. Kilburn, 151 Wn.2d 36, 50, 84 P.3d 1215 (2004)). This standard requires that we "independently review only crucial facts, that is, those facts so intermingled with the legal question that it is necessary to analyze them in order to

6

pass on the constitutional question." State v. Locke, 175 Wn. App. 779, 790, 307 P.3d 771 (2013).

The jury was instructed that to convict Wagner of a hate crime, the State needed to prove beyond a reasonable doubt that (1) on April 14, 2021 Wagner threatened a specific person, (2) Wagner placed that person in reasonable fear of harm to person, (3) *Wagner acted because of his perception of the person's race, color, ancestry, or national origin*, and (4) Wagner acted maliciously and intentionally. (Emphasis added.); RCW 9A.36.080. The hate crime statute is not aimed at speech, but "aimed at criminal conduct and enhances punishment for that conduct where the defendant chooses his or her victim because of their perceived membership in a protected category." State v. Talley, 122 Wn.2d 192, 201, 858 P.2d 217 (1993). Thus, "[a] person may not be convicted of uttering biased remarks during the commission of another crime." State v. Johnson, 115 Wn. App. 890, 896, 64 P.3d 88 (2003). Instead, a hate crime must rest on proof that the defendant selected the victim because of the victim's apparent membership in the protected class. Id.

Wagner argues that because he "behaved aggressively toward everyone," the State cannot prove he singled out Shoemake because of her race. However, Wagner's behavior towards others does not undermine the evidence at trial showing that Wagner threatened Shoemake because of her race. Wagner's motive for saying the things he said to Shoemake is a question of fact. His explicit use of racial epithets was circumstantial evidence that his actions toward Shoemake were because of his perception of her race. RCW 9A.36.080.

7

Furthermore, while true that Wagner was upset about his dogs, the evidence at trial shows that Wagner did not direct any threat at Tenniswood or the arresting officer, both White individuals. Wagner's threatening behavior was directed toward only Shoemake. A rational jury could find the because-of element was met based on Wagner's explicit racial epithets, his disparate treatment of persons of different apparent race, and the racial symbolism of his tattoos, and certainly considering all three together. We conclude the evidence was sufficient that Wagner threatened Shoemake because of her race.

III

Wagner argues that in the absence of Miranda warnings, the trial court should have suppressed statements he made to the police as well as his display of his swastika tattoo in response to Officer Ceban's inquiry.

A

The parties provide differing theories as to the analysis surrounding the admissibility of Wagner's swastika tattoo. Wagner argues the display of the tattoo was expressive conduct responsive to Officer Ceban's inquiry about his tattoo and was thus testimonial. The State has two theories, first that Officer Ceban conducted a search of Wagner's person after Wagner expressly consented, and second, that the tattoo was physical evidence and thus could not be excludable due to a Miranda violation.

At trial, Deputy Jun Wu, a corrections deputy from the county jail, testified that he observed and photographed five tattoos on Wagner's body during the booking process. The State admitted photographs of the tattoos as exhibits 20

8

through 22. Wagner has never objected to Deputy Jun Wu's observations—Deputy Jun Wu's testimony to his observations, or the photographic evidence of the tattoos that Deputy Jun Wu authenticated—either on a constitutional basis or otherwise. Nothing in our record shows that Deputy Jun Wu's observation of the tattoos was related to or derived from Officer Ceban's inquiry at the scene. The tattoos were independently proved without objection and Officer Ceban's testimony describing the swastika tattoo was cumulative of the photographic evidence of the tattoo. Any error in allowing Officer Ceban's description of the swastika tattoo was harmless because it was strictly cumulative. See State v. Flores, 164 Wn.2d 1, 19, 186 P.3d 1038 (2008) (evidence that is merely cumulative of overwhelming untainted evidence is harmless).

B

Likewise, any error in admitting Wagner's statements to Officer Ceban was harmless.

Constitutional errors are prejudicial unless the State establishes beyond a reasonable doubt that any reasonable juror would have reached the same result absent the error. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). When determining whether the constitutional error is harmless, this court applies the untainted evidence test and asks whether the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. Id. at 426.

The untainted evidence at trial showed that Wagner, upon seeing Shoemake in person, started using racial epithets, told Shoemake to "go back to Africa where [she] belong[s]," and threatened to "kick [her] ass." Wagner showed

9

Shoemake a photo of men with rifles and a flag with a swastika on it, and told her " 'We're going to fix this,' " which Shoemake interpreted as a threat. Tenniswood testified how her interactions with Wagner were different than what she observed between Wagner and Shoemake, and stated that the "only time [Wagner's demeanor] changed is when he was interacting with [Shoemake]." Tenniswood stated, "[I]t didn't seem to be about the dogs anymore." Both Tenniswood and the arresting officer testified that Wagner did not insult, threaten, or attack them. Wagner testified that he believed in white separation, and Black individuals should go back to Africa, which he reaffirmed in his letter to the county district court judge. Deputy Jun Wu authenticated photographs showing Wagner's swastika tattoo with its clear racist meaning. Magyarics testified that Wagner's tattoos had certain meanings within white supremacist groups including animus towards non-Caucasians.

In comparison to this evidence, Wagner's additional comments to Officer Ceban referring to a Nationalist Party was cumulative and only relatively less clearly indicative of race-based victim selection than other trial evidence. Any error in admitting the statements would be harmless because "any reasonable trier of fact would have reached the same result," State v. Brown, 140 Wn.2d 456, 468-69, 998 P.2d 321 (2000), based on "the 'overwhelming untainted evidence,' " State v. Thompson, 151 Wn.2d 793, 808, 92 P.3d 228 (2004) (quoting State v. Smith, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)).

IV

Wagner argues the trial court abused its discretion by admitting evidence of his tattoos in violation of ER 403. We disagree.

A trial court's evaluation of relevance under ER 401 and its balancing of probative value against prejudicial effect under ER 403 will be overturned only for manifest abuse of discretion. State v. Russell, 125 Wn.2d 24, 78, 882 P.2d 747 (1994). This occurs when " 'the trial court's exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons.' " State v. Case, 13 Wn. App. 2d 657, 668, 466 P.3d 799 (2020) (internal quotation marks omitted) (quoting State v. Lile, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017)).

Evidence is relevant "if it makes the existence of a fact of consequence more or less probable to be true than without the evidence." State v. Arredondo, 188 Wn.2d 244, 259, 394 P.3d 348 (2017); ER 401. "The threshold to admit relevant evidence is very low" and "[e]ven minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). To prove that Wagner was guilty of a hate crime offense, the State had to prove that Wagner acted because of his perception of Shoemake's race. RCW 9A.36.080. As the testimony at trial established, Wagner's tattoos depicted symbols of white supremacy and racial hatred towards Black individuals. That Wagner had these tattoos made it more likely that he chose to threaten Shoemake because she was Black. It was therefore directly relevant to an issue the jury was required to decide.

The evidence was also not unfairly prejudicial. "Evidence causes unfair prejudice when it is 'more likely to arouse an emotional response than a rational

11

decision by the jury.' " <u>City of Auburn v. Hedlund</u>, 165 Wn.2d 645, 654, 201 P.3d 315 (2009) (internal quotation marks omitted) (quoting <u>State v. Cronin</u>, 142 Wn.2d 568, 584, 14 P.3d 752 (2000)). "[T]he burden of demonstrating unfair prejudice is on the party seeking to exclude the evidence," here, Wagner. <u>State v. Burkins</u>, 94 Wn. App. 677, 692, 973 P.2d 15 (1999). The "linchpin word is 'unfair' " and the court must "weigh the evidence in the context of the trial itself." <u>State. v. Bernson</u>, 40 Wn. App. 729, 736, 700 P.2d 758 (1985).

Where the State must prove that a defendant chose a victim because of the victim's race, evidence that the defendant harbors animus against that race is highly probative and admissible. <u>See</u> <u>Talley</u>, 122 Wn.2d at 211 (a defendant's discriminatory beliefs may offer circumstantial evidence of victim selection). Wagner's tattoos evidencing that animus were not unfairly prejudicial any more than Wagner's use of racial epithets, or his declaration that he believed Black people needed to go back to Africa. Wagner's tattoos evidencing directly relevant racial animus were more probative than unfairly prejudicial. The trial court did not abuse its discretion in admitting the tattoos.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____        _____
Feldman, J.                                              Díaz, J.

12